## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **INDEPENDENCE INSTITUTE,** | ) | |
| a Colorado nonprofit corporation, | ) | |
| 727 E. 16th Avenue | ) | |
| Denver, Colorado 80203 | ) | |
| | ) | Civil Action No. _____ |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Three-Judge Court Requested** |
| | ) | |
| **FEDERAL ELECTION COMMISSION,** | ) | |
| 999 E Street, N.W. | ) | |
| Washington, D.C. 20436 | ) | |
| | ) | |
| **Defendant.** | ) | |

## VERIFIED COMPLAINT

## NATURE OF ACTION

1.      This case challenges the definition of electioneering communications as applied to specific advertisements and the disclosure provisions for electioneering communications as applied to the Independence Institute. Bipartisan Campaign Reform Act of 2002 ("BCRA") Pub. L. No. 107-155 § 201, 116 Stat. 81, 88-89 (2002) (once codified at 2 U.S.C. § 434(f), now codified at 52 U.S.C. § 30104(f)).

2.      Plaintiff Independence Institute is a nonprofit corporation organized under the Internal Revenue Code and under Colorado law. 26 U.S.C. §§ 501(c)(3) (charity status); 170(b)(1)(A)(vi) (public charity-foundation status for revenue generated by donations from the general public); COLO. REV. STAT. §§ 6-16-103(1) (defining "charitable organization"); 7-21-101 *et seq.*

("Colorado Revised Nonprofit Corporation Act") (2013). The Independence Institute conducts research and educates the public on various aspects of public policy—including taxation, education policy, health care, and justice policy. Occasionally, its educational endeavors include advertisements that mention the officeholders who direct such policies. Sometimes, these officeholders are also candidates for office.

3.      The Independence Institute plans to produce an issue advertisement, to be aired on broadcast radio, which will discuss federal sentencing guidelines. The advertisement will mention Senators Mark Udall and Michael Bennet and ask that they support the Justice Safety Valve Act.

4.      The Independence Institute believes that the issue advertisement will qualify as an "electioneering communication" under 2 U.S.C. § 434(f)(3) (now codified at 52 U.S.C. § 30104(f)(3)). Thus, the Independence Institute will be required to report and disclose its donors' names and addresses, pursuant to 2 U.S.C. § 434(f)(1)-(2) (now codified at 52 U.S.C. § 30104(f)(1)-(2)).

5.      The Independence Institute reasonably fears that failure to disclose its donors under 2 U.S.C. § 434(f)(1)-(2) (now codified at 52 U.S.C. § 30104(f)(1)-(2)) will result in enforcement actions, investigations, and penalties levied by the Defendant and its agents.

6.      BCRA's regulation of electioneering communications chills discussion of public policy issues by forcing would-be speakers—including the Independence Institute—to comply with unconstitutional regulatory burdens should it merely mention a candidate for office, even if its speech neither promotes nor disparages that candidate.

**JURISDICTION**

7.      This Court has jurisdiction because this action arises under the First Amendment to the United States Constitution. 28 U.S.C. § 1331 (federal question).

8.      This Court has jurisdiction to grant relief under The Declaratory Judgment Act. *See* 28 U.S.C. §§ 2201 and 2202.

9.      Because this is a constitutional challenge to a provision of BCRA, this Court has jurisdiction under BCRA § 403 to convene a three-judge court. BCRA §§ 403(a)(1) (jurisdiction of this Court) and (d)(2) (actions brought after Dec. 31, 2006), 116 Stat. at 113-14 (once codified at 2 U.S.C. § 437h note, now codified at 52 U.S.C. § 30110 note). *See also* 28 U.S.C. § 2284 (three-judge court composition and procedure); LCvR 9.1 (governing three-judge court procedure in this District).

10.     Therefore, plaintiffs will seek to have this matter heard by a three-judge panel of this Court.

**VENUE**

11.     Venue is proper under 28 U.S.C. §§ 1391(b)(1) ("a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located") and (b)(2) (the "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred").

12.     Venue is proper under 28 U.S.C. §§ 1391(e)(1)(A) (in a civil action against an agency, the judicial district where "a defendant in the action resides") and (e)(1)(B) (in a civil action against an agency, the judicial district where "a substantial part of the events or omissions giving rise to the claim occurred").

13.     Venue is also proper under BCRA § 403(a)(1) (once codified at 2 U.S.C. § 437h note, now codified at 52 U.S.C. § 30110 note) ("the action shall be filed in the United States District Court for the District of Columbia").

## PARTIES

14.     Established in 1985, the Independence Institute is a nonprofit corporation organized under the Internal Revenue Code and under Colorado law. 26 U.S.C. §§ 501(c)(3) (charity status); 170(b)(1)(A)(vi) (public charity-foundation status for revenue generated by donations from the general public); COLO. REV. STAT. §§ 6-16-103(1) (defining "charitable organization"); 7-21-101 *et seq*. ("Colorado Revised Nonprofit Corporation Act").

15.     Defendant Federal Election Commission ("FEC" or "Commission") is the agency charged with "exclusive jurisdiction with respect to the civil enforcement" of the Federal Election Campaign Act ("FECA") (once codified at 2 U.S.C. § 431 *et seq*., now codified at 52 U.S.C. § 30101 *et seq*.) and its amendments—including BCRA. 2 U.S.C. § 437c(b)(1) (now codified at 52 U.S.C. § 30106(b)(1)). The FEC is to "administer, seek to obtain compliance with, and formulate policy with respect to" the federal campaign finance regime. *Id*.

## FACTS

16.     This case arises from BCRA § 201, defining and governing "electioneering communications." BCRA § 201, 116 Stat. at 88-89 (once codified at 2 U.S.C. § 434(f), now codified at 52 U.S.C. § 30104(f)).

17.     The general election in Colorado is scheduled for November 4, 2014. COLO. REV. STAT.§ 1-1-104(17) ("'General election' means the election held on the Tuesday succeeding the first Monday of November in each even-numbered year").

**The Independence Institute and its tax status**

18.     Established May 31, 1985, the Independence Institute is a nonprofit corporation organized under the Internal Revenue Code ("IRC") and under Colorado law. 26 U.S.C. §§ 501(c)(3) (charity status); 170(b)(1)(A)(vi) (public charity-foundation status for revenue generated by donations from the general public); COLO. REV. STAT. §§ 6-16-103(1) (defining "charitable organization"); 7-121-101 *et seq.* ("Colorado Revised Nonprofit Corporation Act").

19.     The Independence Institute's mission is "to empower individuals and to educate citizens, legislators[,] and opinion makers about public policies that enhance personal and economic freedom." *See* INDEPENDENCE INSTITUTE "Mission Statement" *available at* http://www.i2i.org/about.php.

20.     The Independence Institute's president is Jon Caldara.

21.     Organizations exempt from taxation under §501(c)(3) may not engage in activity supporting or opposing a candidate. 26 U.S.C. §501(c)(3) (banning "participat[ion] in, or interven[tion] in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office").

22.     In applying the IRC's prohibition of § 501(c)(3) political activity, the Internal Revenue Service ("IRS") has issued regulations and guidance on what does and does not constitute political activity. For example, voter registration drives and "get-out-the-vote" drives—if conducted in a nonpartisan manner—are not political activity. *See* Rev. Rul. 2007-41, 2007-25 I.R.B. 1421, 1422; *see also FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 263-264 (1986) ("*MCFL*") (holding federal independent expenditure ban for corporations was unconstitutional as

applied to a nonprofit's voter guide). Likewise, nonpartisan candidate fora are not political activity. Rev. Rul. 2007-41, 2007-25 I.R.B. at 1421; Rev. Rul. 66-256 2 C.B. 210 (1966).

23.     However, BCRA § 201 specifically differentiates between the "political activity" covered by the § 501(c)(3) prohibition and "electioneering communications." 2 U.S.C. § 434(f)(7) (now codified at 52 U.S.C. § 30104(f)(7)) ("[n]othing in this subsection may be construed to establish, modify, or otherwise affect the definition of political activities or electioneering activities…for purposes of the Internal Revenue Code"). Thus, "electioneering communications" are distinct from "political activity" under tax law.

24.     The Independence Institute is not under the control or influence of any political candidate.

25.     The Independence Institute is not under the control or influence of any political party.

26.      "Public charity" § 501(c)(3) organizations may engage in only limited lobbying activity. 26 U.S.C. § 501(c)(3) ("An organization is not operated exclusively for one or more exempt purposes if…a substantial part of its activities is attempting to influence legislation by propaganda or otherwise"); 26 C.F.R 1.501(c)(3)-1(c)(3).

27.     An organization may elect treatment under IRC § 501(h), which permits it to spend a defined portion of its budget on lobbying. 26 U.S.C. §§ 501(h)(2)(B) and (D).

28.     The Independence Institute elects treatment under § 501(h).

29.     Federal law safeguards the privacy of donors to § 501(c)(3) organizations. *See*, *e.g.*, 26 U.S.C. § 6104(d)(3)(A) (prohibiting, in the case of organizations recognized under § 501(c)(3), "the disclosure of the name or address of any contributor to the organization").

**The advertisement**

30.     As part of its mission, the Independence Institute wishes to run an advertisement discussing federal sentencing guidelines.

31.     The advertisement will clearly mention the sitting United States Senators from Colorado, Mark Udall and Michael Bennet, the former of whom is also a candidate for re-election in November 2014.

32.     The advertisement will be approximately 60 seconds in length, and be distributed over local broadcast radio in Colorado on major AM radio stations—850 KOA and 630 KHOW.

33.     The advertisement will reach more than 50,000 natural persons in the Denver metropolitan area.

34.     The Independence Institute intends to spend more than $10,000 on the advertisement.

35.     The advertisement will read as follows:

*Independence Institute*
*Radio :60*
*"Let the punishment fit the crime"*

Let the punishment fit the crime.

But for many federal crimes, that's no longer true.

Unfair laws tie the hands of judges, with huge increases in prison costs that help drive up the debt.

And for what purpose?

Studies show that these laws don't cut crime.

In fact, the soaring costs from these laws make it harder to prosecute and lock up violent felons.

Fortunately, there is a bipartisan bill to help fix the problem – the Justice Safety Valve Act, bill number S. 619.

It would allow judges to keep the public safe, provide rehabilitation, and deter others from committing crimes.

Call Senators Michael Bennet and Mark Udall at 202-224-3121. Tell them to support S. 619, the Justice Safety Valve Act.

Tell them it's time to let the punishment fit the crime.

Paid for by Independence Institute, I2I dot org. Not authorized by any candidate or candidate's committee. Independence Institute is responsible for the content of this advertising.

36.     The Independence Institute wishes to raise funds for this specific advertisement from individual donors, independent of its general fundraising efforts for other programs.

37.     The Independence Institute wishes to raise funds for the specific advertisement, including seeking donations in amounts greater than $1,000 from individual donors.

38.     The Independence Institute guards the privacy of its donors and therefore does not wish to disclose their names and addresses on an electioneering communications report. If forced to do so, it will not run the advertisement.

## THE LAW AT ISSUE

### The statutory and regulatory definition of "electioneering communications"

39.     Departing from the traditional "issues speech versus candidate speech" dichotomy, BCRA created a new form of speech to be regulated. "Electioneering communications" are

> [A]ny broadcast, cable, or satellite communication which—(I) refers to a clearly identified candidate for Federal office; (II) is made within—(aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or (bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and (III) in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.

2 U.S.C. § 434(f)(3)(A)(i) (now codified at 52 U.S.C. § 30104(f)(3)(A)(i)).

40.    "Targeted to the relevant electorate" is a term of art, with a specific definition under

BCRA, meaning:

> a communication which refers to a clearly identified candidate for Federal office
> is "targeted to the relevant electorate" if the communication can be received by
> 50,000 or more persons—(i) in the district the candidate seeks to represent, in the
> case of a candidate for Representative in, or Delegate or Resident Commissioner
> to, the Congress; or (ii) in the State the candidate seeks to represent, in the case of
> a candidate for Senator.

2 U.S.C. § 434(f)(3)(C) (now codified at 52 U.S.C. § 30104(f)(3)(C)).

41.    Since the general election is on November 4, 2014, sixty days prior to the general

election is Friday, September 5, 2014. FEDERAL ELECTION COMMISSION, *Colorado 2014 Federal*

*Election Compliance Information*, http://www.fec.gov/info/ElectionDate/2014/CO.shtml (last

accessed July 29, 2014).

42.    BCRA provides exemptions to the definition of "electioneering communications,"

including a press exemption (2 U.S.C. § 434(f)(3)(B)(i) (now codified at 52 U.S.C. §

30104(f)(3)(B)(i))) and an exemption for candidate fora (2 U.S.C. § 434(f)(3)(B)(iii) (now

codified at 52 U.S.C. § 30104(f)(3)(B)(iii))).

43.    BCRA also exempts "a communication which constitutes an expenditure or an

independent expenditure under this Act" from the electioneering communications definition. 2

U.S.C. § 434(f)(3)(B)(ii) (now codified at 52 U.S.C. § 30104(f)(3)(B)(ii)). That is,

expenditures—communications that expressly advocate for or against a specified candidate—are

not "electioneering communications." *See Buckley v. Valeo*, 424 U.S. 1, 42 (1976) (regulation of

expenditures "must be construed to apply only to expenditures for communications that in

express terms advocate the election or defeat of a clearly identified candidate for federal office"). Thus, electioneering communications do not contain express advocacy.

44.     Organizations exempt from taxation under § 501(c)(3) may not engage in activity supporting or opposing a candidate. 26 U.S.C. § 501(c)(3). BCRA § 201 specifically differentiates, however, between the § 501(c)(3) "political activity" prohibition and activities that constitute "electioneering communications." 2 U.S.C. § 434(f)(7) (now codified at 52 U.S.C. § 30104(f)(7)) ("Nothing in this subsection may be construed to establish, modify, or otherwise affect the definition of political activities or electioneering activities…for purposes of the Internal Revenue Code…."). Thus, "electioneering communications" are distinct from the "political activity" regulated under the tax laws.

45.     The FEC promulgated rules to give effect to BCRA. *See*, *e.g.*, Federal Election Commission, Electioneering Communications Notice 2002-20, 67 Fed. Reg. 65190 (Oct. 23, 2002) (initial regulation).

46.     The FEC defined communications as referring to a "clearly identified candidate" when: "the candidate's name, nickname, photograph, or drawing appears, or the identity of the candidate is otherwise apparent through an unambiguous reference…." 11 C.F.R. § 100.29(b)(2).

47.     Likewise, the FEC clarified the "targeted to the relevant electorate" standard, as defined by a radio station's audience. 11 C.F.R. §§ 100.29(b)(7)(i)(C) (station within the relevant jurisdiction of the election) and (D) (station only partially within the relevant jurisdiction with the election).

48.     The FEC and the Federal Communications Commission have produced a database to determine if a station's coverage qualifies under BCRA's definition of targeting the relevant electorate. 11 C.F.R. § 100.29(b)(6)(i).

49.     According to the FEC's website, advertisements run on KOA and KHOW are targeted to the Colorado electorate. FCC MEDIA BUREAU, THE ELECTIONEERING COMMUNICATION DATABASE (last accessed July 31, 2014), http://apps.fcc.gov/ecd/ (search run by choosing "Federal Senate Race," "Colorado," "AM stations" and running "KOA" and "KHOW").

**Disclosure requirements for "electioneering communications"**

50.     Electioneering communications disclosure under BCRA is triggered once an organization spends $10,000 on electioneering communications during any calendar year. 2 U.S.C. § 434(f)(1) (now codified at 52 U.S.C. § 30104(f)(1)). Once disclosure is triggered, every disbursement over $200 must be reported. 2 U.S.C. § 434(f)(2)(C) (now codified at 52 U.S.C. § 30104(f)(2)(C)).

51.     Disclosure is due within approximately 24 hours of the disbursement. 2 U.S.C. § 434(f)(1) (now codified at 52 U.S.C. § 30104(f)(1)); 2 U.S.C. § 434(f)(4) (now codified at 52 U.S.C. § 30104(f)(4)) (defining "disclosure date" as "the first date during any calendar year by which a person has made [qualifying] disbursements for… electioneering communications…; and any other date during such calendar year by which a person has made [qualifying] disbursements for… electioneering communications… since the most recent disclosure date for such calendar year"); *but see* 11 C.F.R. § 104.20(b) ("[e]very person who has made an electioneering communication, as defined in 11 C.F.R. 100.29… shall file a statement with the

Commission by 11:59 p.m. Eastern Standard/Daylight Time on the day following the disclosure date").

52.     Electioneering communications disclosure includes the "identification of the person making the disbursement, of any person sharing or exercising direction or control over the activities of such person, and of the custodian of the books and accounts of the person making the disbursement." 2 U.S.C. § 434(f)(2)(A) (now codified at 52 U.S.C. § 30104(f)(2)(A)). The principal place of business of the organization is also disclosed. 2 U.S.C. § 434(f)(2)(B) (now codified at 52 U.S.C. § 30104(f)(2)(B)).

53.     If the funds to pay for the electioneering communication came out of a special, segregated account, then only the "the names and addresses of all contributors who contributed an aggregate amount of $ 1,000 or more to that account during the period beginning on the first day of the preceding calendar year and ending on the disclosure date" must be disclosed. 2 U.S.C. § 434(f)(2)(E) (now codified at 52 U.S.C. § 30104(f)(2)(E)).

54.     If the funds used to pay for the electioneering communication came from an account not described in 2 U.S.C. § 434(f)(2)(E) (now codified at 52 U.S.C. § 30104(f)(2)(E)), then "the names and addresses of *all contributors* who contributed an aggregate amount of $1,000 or more to the person" must be disclosed. 2 U.S.C. § 434(f)(2)(F) (now codified at 52 U.S.C. § 30104(f)(2)(F)) (emphasis added). Thus, without first forming a separate account, an organization faces the very real possibility of being required to disclose *all* of its donors, should it disseminate an electioneering communication.

55.     The FEC believes that 2 U.S.C. §§ 434(f)(2)(E) and 434(f)(2)(F) (now codified at 52 U.S.C. §§ 30104(f)(2)(E) and 30104(f)(2)(F)), taken together, mean that only donations of

$1,000 or more—earmarked for electioneering communications—are required to be disclosed. 11 C.F.R. § 104.20(c)(9). This construction was recently tacitly upheld in *Center for Individual Freedom v. Van Hollen*, 694 F.3d 108, 110 (D.C. Cir. 2012) (per curiam). But the D.C. Circuit vacated and remanded the case for further consideration of a proposed rulemaking clarifying the FEC's justification for its rule. *Id*. at 112. Absent a new rulemaking, the district court in *Van Hollen* has been ordered to perform a *Chevron* step two analysis. *Id*.

56.     Failure to disclose and report the donors who earmark their donations for the proposed advertisement will result in investigations, prosecutions, possible criminal liability and substantial civil penalties. 2 U.S.C. § 437g (now codified at 52 U.S.C. § 30109) (detailing investigatory and enforcement process by the FEC along with referral to the attorney general for criminal prosecution).

## SUPREME COURT DECISIONS REGARDING ISSUE ADVOCACY

### *Buckley v. Valeo*

57.     The Supreme Court's touchtone for all campaign finance law is *Buckley v. Valeo*, 424 U.S. 1 (1976), an omnibus facial challenge to the Federal Election Campaign Act ("FECA") (once codified at 2 U.S.C. § 431 *et seq*., now codified at 52 U.S.C. § 30101 *et seq*.).

58.     One aspect of FECA limited the amount spent on independent communications made "relative to a clearly identifiable candidate." *Id*. at 7.

59.     The language "relative to a clearly identifiable candidate" was found unconstitutionally vague because the "distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application. Candidates,

especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions." *Id.* at 42.

60.     To avoid this vagueness, the Supreme Court said FECA "must be construed to apply only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." *Id.*

61.     Specifically, the Court limited regulable speech to "express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' [and] 'reject.'" *Id.* at 44 n. 52.

62.     In this way, the Court explicitly acted to prevent the federal campaign finance regime from reaching speech discussing issues of public policy. For decades, this "express advocacy" test (or "*Buckley*'s 'magic words'"—including synonymous words or phrases) remained the hallmark for examining communications.

63.     In addition to distinguishing between issue speech and campaign speech, the Supreme Court has also recognized that disclosure implicates the First Amendment freedom of association. *Buckley*, 424 U.S. at 75.

64.     To prevent the federal disclosure requirement from reaching groups that merely mentioned candidates in the context of issue speech, the *Buckley* Court construed the relevant provisions to apply *only* to "organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." *Id.* at 79.

65.     Expenditures by groups under the control of a candidate or with "the major purpose" of supporting or opposing a candidate "are, by definition, campaign related." *Id.* This language,

now known as "the major purpose test," effectively narrowed the reach of FECA's disclosure provisions to protect the associational freedoms of individuals and groups speaking about issues.

66.     As applied to individuals and groups that did *not* have "the major purpose" of political activity, the *Buckley* Court narrowed the definition of "expenditures" in the same way—"to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id*. at 80. To describe the term "expressly advocate," the Court simply incorporated the "magic words" examples listed in footnote 52. *Id*. at 80 n. 108 (incorporating *id*. at 44 n. 52).

67.     Under *Buckley*, disclosure of donors is appropriate only when an organization is under the control of a candidate or has the major purpose of supporting or opposing clearly identified candidates. To protect issue speech, *Buckley* demanded express advocacy before speech-suppressing regulations could take effect.

### *McConnell v. FEC*

68.     In 2002, Congress again substantively overhauled the federal campaign finance regime, creating a new category of communications called "electioneering communications." BCRA § 201, 116 Stat. at 88 (once codified at 2 U.S.C. § 434(f)(3)(A)(i), now codified at 52 U.S.C. § 30104(f)(3)(A)(i)); *McConnell v. FEC*, 540 U.S. 93, 189 (2003) *overruled in part by Citizens United v. FEC*, 558 U.S. 310 (2010)).

69.     An omnibus facial challenge was brought against BCRA. *See McConnell* 540 U.S. at 194 (discussing facial overbreadth challenge to electioneering communications provisions).

70. The new "electioneering communications" term was a response to the rise of "sham issue advocacy…candidate advertisements masquerading as issue ads." *McConnell*, 540 U.S. at 132 (internal quotations omitted).

71. With this in mind and in the context of a facial challenge, the Supreme Court examined the ban on electioneering communications by corporations and unions. *McConnell*, 540 U.S. at 206 (examining BCRA § 203 (once codified at 2 U.S.C. § 441b(b)(2), now codified at 52 U.S.C. § 30118(b)(2)).

72. The Court noted a study in the *McConnell* record that found "the vast majority of ads" which would be regulated as electioneering communications "clearly had" an electioneering purpose. *Id.*

73. Therefore, while pure issue speech could not be regulated as an electioneering communication, the government could regulate speech *if* ads "broadcast during the 30- and 60-day periods preceding federal primary and general elections *are the functional equivalent of express advocacy*." *Id.* (emphasis added). Consequently, the Court upheld the statute against a facial challenge. *Id.*

74. But the *McConnell* Court "assume[d] that the interests that justify the regulation of campaign speech might not apply to the regulation of *genuine issue ads*," and thus left open the possibility for future, as-applied challenges. *Id.* at 206, n. 88 (emphasis added).

### FEC v. Wisconsin Right to Life

75. Four years later, the Court addressed just such an as-applied challenge involving the ban on corporation-funded electioneering communications. *FEC v. Wis. Right to Life, Inc.*, 551 U.S.

449 (2007) ("*WRTL II*"). *WRTL II* examined the distinction between issue advocacy and candidate advocacy under "the functional equivalent of express advocacy" test. *Id.* at 455-56.

76.     Returning to *Buckley*, *WRTL II* noted the difficulty of distinguishing "between discussion of issues on the one hand and advocacy of election or defeat of candidates on the other," and therefore rejected "analyzing the question in terms 'of intent and of effect'" as it "would afford 'no security for free discussion.'" *Id*. at 467 (quoting *Buckley*, 424 U.S. at 43).

77.     Consequently, "a court should find that an ad is the functional equivalent of express advocacy only if the ad *is susceptible of no reasonable interpretation other than as an appeal to vote* for or against a specific candidate." *Id*. at 469-470 (emphasis added); *see also Citizens United v. FEC*, 558 U.S. 310, 324-25 (quoting and applying this test).

78.     Invoking this standard, the *WRTL II* Court found that BCRA § 203's ban did not apply to the nonprofit's three proposed advertisements:

> Under this test, WRTL's three ads are plainly not the functional equivalent of express advocacy. First, their content is consistent with that of a genuine issue ad: The ads focus on a legislative issue, take a position on the issue, exhort the public to adopt that position, and urge the public to contact public officials with respect to the matter. Second, their content lacks indicia of express advocacy: The ads do not mention an election, candidacy, political party, or challenger; and they do not take a position on a candidate's character, qualifications, or fitness for office.

*Id*. at 470 (Roberts, C.J., controlling opinion); *see also id*. at 482 (announcing decision of the Court upholding the district court's ruling that the advertisements were not subject to the ban in BCRA § 203).

79.     The controlling opinion specifically rejected the assertion that "any ad covered by § 203 that includes an appeal to citizens to contact their elected representative is the 'functional

equivalent' of an ad saying defeat or elect that candidate." *Id.* (internal quotations and citation omitted).

80.    Noting that the "Court has never recognized a compelling interest in regulating ads, like WRTL's, that are neither express advocacy nor its functional equivalent," the controlling opinion agreed with the district court below that there was no compelling interest in regulating the advertisements. *Id.* at 476 (approving of *Wis. Right to Life, Inc. v. FEC*, 466 F. Supp. 2d 195, 208-210 (D.D.C. 2006)); *Id.* at 481.

### *Citizens United v. FEC*

81.    The Court struck down the corporate independent expenditure ban (both BCRA § 203 and other parts of 2 U.S.C. § 441b, now 52 U.S.C. § 30118) in *Citizens United v. FEC*, 558 U.S. at 372. In so doing, the Court specifically upheld BCRA's disclosure and disclaimer requirements. *Id.* But "this part of the opinion is quite brief." *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 824 (7th Cir. 2014).

82.    Citizens United argued that "the disclosure requirements in § 201 must be confined to speech that is the functional equivalent of express advocacy…," but the Court "reject[ed] this contention." *Citizens United*, 558 U.S. at 368-69. The Court held that disclosure is "a less restrictive alternative to more comprehensive regulations of speech." *Id.* at 369 (citing *MCFL*, 479 U.S. at 262 and *Buckley*, 424 U.S. at 75-76).

83.    In *Citizens United*, the organization produced a film called *Hillary: The Movie* ("*Hillary*") and several advertisements to promote the film. *Id.* at 320.

84.     Central to the Court's disposition of the challenge to corporate independent expenditures was whether *Hillary* and its supporting advertisements were express advocacy or its functional equivalent, as articulated in *WRTL II*. *Citizens United*, 558 U.S. at 324-25.

85.     The Court explicitly held that *Hillary* was the functional equivalent of express advocacy under the *WRTL II* test. *Id*. at 325.

86.     Turning to the advertisements, the Court held that "[t]he ads fall within BCRA's definition of an 'electioneering communication'" because "[t]hey referred to then-Senator Clinton by name shortly before a primary and contained pejorative references to her candidacy." *Id*. at 368.

87.     The Seventh Circuit has stated that the *Citizens United* Court's reasoning on electioneering communication disclosure "was dicta. The Court had already concluded that *Hillary* and the ads promoting it were the equivalent of express advocacy." *Barland*, 751 F.3d at 836 (citations omitted). Given that the Court had already found *Hillary* to be express advocacy, and the advertisements to be "pejorative," the holding does not address advertisements that are pure issue advocacy.

88.     As *Buckley* observed, "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application." *Buckley*, 424 at 42.

89.     Speech, under the law, lies on a spectrum. On one end sits express advocacy—speech using *Buckley*'s magic words of "support" or "reject" or their synonyms in connection with a specific candidacy. *See id*. at 44 n. 52. Next to express advocacy sit communications that do not use *Buckley*'s magic words but are nonetheless the "functional equivalent of express advocacy,"

under the test articulated in *WRTL II* and found to apply to the communications at issue in *Citizens United*. *WRTL II*, 551 U.S. at 469-70; *Citizens United*, 558 U.S. at 325; *id*. at 368.

90.     But on the other end of the spectrum is pure issue advocacy—discussion of public policy that also asks elected leaders to take action. The Independence Institute's advertisement is pure issue advocacy. It simply educates the public and asks Colorado's senator to support the Justice Safety Valve Act.

91.     In rejecting the organization's claim that disclosure would harm its donors, the Court noted that the organization had already disclosed its donors in the past. *Citizens United*, 558 U.S. at 370. But Citizens United is a IRC § 501(c)(4) organization. *Citizens United v. FEC*, 530 F. Supp. 2d 274, 275 (D.D.C. 2008). Thus, the court did not examine the dangers of disclosure in the more sensitive IRC § 501(c)(3) context.

92.     The problem of disclosure attendant to "electioneering communications" has not been directly addressed by the Supreme Court in the situation of pure issue advocacy by an IRC § 501(c)(3) nonprofit organization (which, by statute, cannot engage in *any* political activity). 26 U.S.C. § 501(c)(3).

### The D.C. Circuit in *Buckley v. Valeo*

93.     In the *en banc* D.C. Circuit decision in *Buckley v. Valeo*, the Court of Appeals was asked to interpret 2 U.S.C. § 437a. *Buckley v. Valeo*, 519 F.2d 821, 869-870 (D.C. Cir. 1975) *aff'd in part and rev'd in part* 424 U.S. 1 (1976).

94.     Later repealed, the provision provided for disclosure of organizations

who publish[] or broadcast[] to the public any material referring to a candidate (by name, description, or other reference) advocating the election or defeat of such candidate, setting forth the candidate's position on any public issue, his voting record, *or other official acts (in the case of a candidate who holds or has*

> *held Federal office),* or otherwise designed to influence individuals to cast their
> votes.

*Id.* (emphasis added) (quoting 2 U.S.C. § 437a (repealed by Federal Election Campaign Act Amendments of 1976 Pub. L. 94-283 § 105 90 Stat. 475, 481 (1976))). The problem was that this provision covered the activity of nonprofit organizations, such as the New York Civil Liberties Union, that engaged in issue advocacy. *Id.* at 871.

95.     The Supreme Court never reviewed this provision of FECA because the government did not appeal the holding of the D.C. Circuit. *Buckley*, 424 U.S. at 11 n. 7.

96.     The D.C. Circuit's *Buckley* opinion recognized that "compelled disclosure…can work a substantial infringement on the associational rights of those whose organizations take public stands on public issues." *Id.* at 872 (citing *NAACP v. Alabama*, 357 U.S. at 462; *Bates*, 361 U.S. at 522-524).

97.     Even though "discussion of important public questions can possibly exert some influence on the outcome of an election" the "nexus may be far more tenuous" then in the context of advocacy for or against candidates. *Id.* at 872-73.

98.     Therefore the law is not allowed to equate "groups seeking only to advance discussion of public issues or to influence public opinion" with "groups whose relation to political processes is direct and intimate." *Id.* at 873.

99.     These principles are unmodified by the subsequent Supreme Court decision and therefore remain good law in this Circuit.

## CAUSES OF ACTION

### Count 1:
### Declaratory judgment regarding BCRA's definition of "electioneering communications" as applied to the Independence Institute's proposed advertisements

100.    Plaintiff realleges and incorporates by reference paragraphs 1 through 99.

101.    The Supreme Court described the dichotomy between issue speech and political speech in *Buckley*. Noting that "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application," the Court created the express advocacy standard to *protect* issue speech from the regulations applicable to political speech. *Buckley*, 424 U.S. at 42.

102.    But BCRA § 201 regulates communications near an election that contain mere mention of a "clearly identified candidate." 2 U.S.C. §§ 434(f)(3)(A)(i) (now codified at 52 U.S.C. § 30104(f)(3)(A)(i)); 11 C.F.R. § 100.29(b)(2).

103.    *McConnell* upheld this regulation on its face, fearing "sham issue advocacy." *McConnell*, 540 U.S. at 132 (internal quotations omitted). But this conclusion, reached in a facial context, was premised explicitly on a record demonstrating that the vast majority of the covered ads were the functional equivalent of express advocacy. *Id.* at 206.

104.    Indeed, *McConnell* Court specifically "assume[d] that the interests that justify the regulation of campaign speech might not apply to the regulation of *genuine issue ads*." *Id.* at 206 n. 88 (emphasis added).

105.    In this case, the Independence Institute presents a genuine issue advertisement that merely mentions Senator Udall, a candidate for reelection to represent Colorado in the Senate, together with his Senate colleague who is not a candidate for reelection.

106.     Although the advertisement mentions Senator Udall, a candidate in the upcoming general election, the advertisement is not presently an electioneering communication because it is not yet within the 60-day electioneering communication period before the general election.

107.     Considering the time needed to raise funds for and produce the advertisement, the advertisement will run after September 5, 2014, and consequently during the electioneering communications period.

108.     The proposed advertisement does not qualify under BCRA's press exemption, since they are paid advertisements, not "communication[s] appearing in a news story, commentary, or editorial distributed through the facilities of any broadcasting station." 2 U.S.C. § 434(f)(3)(B)(i) (now codified at 52 U.S.C. § 30104(f)(3)(B)(i)).

109.     Since the proposed advertisement merely mentions Senator Udall (and contain no words of express advocacy or its functional equivalent), it does not qualify as an independent expenditure exempted under 2 U.S.C. § 434(f)(3)(B)(ii) (now codified at 52 U.S.C. § 30104(f)(3)(B)(ii)). Likewise, it is not an expenditure. *Id.* In either case, it is not likely to be "reported under the Act or Commission regulations" and therefore is not eligible under that exemption. 11 C.F.R. § 100.29(c)(3).

110.     Nor does the advertisement constitute a debate forum or a call to hold such a forum. Thus, it is not exempt under 2 U.S.C. § 434(f)(3)(B)(iii) (now codified at 52 U.S.C. § 30104(f)(3)(B)(iii)).

111.     Finally, 2 U.S.C. § 434(f)(3)(b)(iv) (now codified at 52 U.S.C. § 30104(f)(3)(b)(iv)) ("other communications") likely does not apply since the proposed advertisement unambiguously refers to a candidate for office and satisfies the other electioneering

communication requirements. *See*, *e.g.*, *McConnell v. FEC*, 251 F. Supp. 2d 176, 282-283, 368 (D.D.C. 2003) *aff'd in part and rev'd in part*, 540 U.S. 93 (noting that the 2 U.S.C. § 434(f)(3)(b)(iv) (now 52 U.S.C. § 30104(f)(3)(b)(iv)) exemption was not to apply to issue advocacy). Therefore, no BCRA exemption applies.

112.    Because none of the statutory electioneering communication exemptions apply, the Independence Institute is left to choose between burdensome regulation and the violation of its donors' privacy, or remaining silent. The Independence Institute's speech is, consequently, chilled.

113.    Since the proposed advertisement is not "an appeal to vote for or against a specific candidate," but rather a genuine discussion of a pressing issue of public concern, BCRA § 201 is overbroad as applied to the Independence Institute's advertisement.

114.    Therefore, the Independence Institute seeks a declaration that 2 U.S.C. § 434(f)(3)(A)(i) (now codified at 52 U.S.C. § 30104(f)(3)(A)(i)) is overbroad as applied to the Independence Institute's proposed advertisement.

**Count 2:**
**Declaratory judgment on the associational burdens of BCRA's electioneering**
**communications disclosure provision as applied to the Independence Institute**

115.    Plaintiff realleges and incorporates by reference paragraphs 1 through 114.

116.    The Independence Institute's planned advertisement is genuine issue speech.

117.    The Independence Institute wishes to raise funds for this specific advertisement, including soliciting donations greater than $1,000 from individual donors.

118.    Due to the sensitive nature of § 501(c)(3) donor lists, the Independence Institute wishes to keep such donations private, and therefore does not wish to disclose its donors on an

electioneering communications report, as required by 2 U.S.C. §§ 434(f)(1)-(2) (now 52 U.S.C. §§ 30104(f)(1)-(2)).

119.    Failure to disclose and report the donors who support the proposed advertisement will subject the Independence Institute to investigations, prosecutions, possible criminal liability, and substantial civil penalties. 2 U.S.C. § 437g (now codified at 52 U.S.C. § 30109) (detailing investigatory and enforcement process by the FEC along with referral to the attorney general for criminal prosecution).

120.    The Supreme Court has consistently recognized the danger of requiring disclosure of donors to nonprofit organizations. *See*, *e.g.*, *Buckley*, 424 U.S. at 64 (citing *Gibson v. Florida Legislative Comm.*, 372 U.S. 539 (1963); *NAACP v. Button*, 371 U.S. 415 (1963); *Shelton v. Tucker*, 364 U.S. 479 (1960); *Bates v. Little Rock*, 361 U.S. 516 (1960); *NAACP v. Alabama*, 357 U.S. 449 (1958)).

121.    Under *Buckley*, disclosure is only appropriate for groups "that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." *Id*. at 79.

122.    Likewise, if a group does not have "the major purpose" of political activity, then only communications that "expressly advocate the election or defeat of a clearly identified candidate" are subject to disclosure. *Id*. at 80.

123.    Nevertheless, BCRA § 201 demands the name and address for every person who gives more than $1,000 to an organization that wishes to run an issue advertisement that happens to mention a candidate for office within the electioneering communications window. 2 U.S.C. § 434(f)(2) (now codified at 52 U.S.C. § 30104(f)(2)).

124.    Indeed, unless the organization uses a segregated account, *every* donor who gives more than $1,000 to the organization—even if they do not earmark their donation, and even if they have no knowledge of the particular electioneering communication—may need to be reported. *Compare* 2 U.S.C. § 434(f)(2)(E) *with* 2 U.S.C. § 434(f)(2)(F) (now 52 U.S.C. § 30104(f)(2)(E) *with* 52 U.S.C. § 30104(f)(2)(F)). While the Commission does not read the statute in this manner, that rule is currently the subject of pending litigation. 11 C.F.R. § 104.20(c)(9); *Van Hollen*, 694 F.3d at 110.

125.    Therefore, the "earmarked only" reading of disclosure rests on unsteady footing, posing an even greater risk that the Independence Institute may be forced to disclose *all* of its donors, merely because it engaged in a single instance of issue speech.

126.    While *Citizens United* upheld similar disclosure, it was in the context of an IRC § 501(c)(4) organization making a film and advertisements that were the "functional equivalent of express advocacy." This case presents distinctly different facts.

127.    The Independence Institute and similarly situated groups organized under IRC § 501(c)(3) must remain silent on *issues* 60 days before a general election, if they wish to protect their donors private information, consistent with federal statutory and judicial safeguards.

128.    The Independence Institute wishes to raise funds to run the proposed advertisement, but cannot for fear that the donors who give more than $1,000 will be disclosed. BCRA's electioneering communications disclosure makes the Independence Institute choose between disclosing its donors and remaining silent on issues central to its mission.

129.    Therefore, the Independence Institute seeks a declaration that, as applied to the Independence Institute's proposed advertisement, 52 U.S.C. § 30104(f)(1)-(2)'s disclosure provisions are overbroad.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A.      A declaration that definition of "electioneering communication" in 2 U.S.C. § 434(f)(3)(A)(i) (now codified at 52 U.S.C. § 30104(f)(3)(A)(i)) is overbroad as applied to the Independence Institute's proposed advertisement.

B.      A declaration that the electioneering communication disclosure regime in 2 U.S.C. §§ 434(f)(1)-(2) (now codified at 52 U.S.C. §§ 30104(f)(1)-(2)) is overbroad as applied to the Independence Institute and its proposed advertisement.

C.      Such injunctive relief as this Court may direct.

D.      Any other relief this Court may grant in its discretion.

Respectfully submitted this 2nd day of September, 2014.

s/ Allen Dickerson
Allen Dickerson (DC Bar No. 1003781)
Tyler Martinez*
Center for Competitive Politics
124 S. West Street
Suite 201
Alexandria, Virginia 22314
Phone: 703.894.6800
Facsimile: 703.894.6811
adickerson@campaignfreedom.org
tmartinez@campaignfreedom.org

*Counsel for Plaintiff*
*Admission pro hac vice pending*

## VERIFICATION

STATE OF COLORADO                              )
                                               ) ss.
COUNTY OF _____Denver_____ )

I, Jon Caldara, president of the Independence Institute,  being first duly sworn, state

under oath that I have read the foregoing VERIFIED COMPLAINT, and that the statements

contained therein are true and correct to the best of my knowledge, information, and belief.

_____

Subscribed and sworn before me this 29 day of August, 2014.

_____
Notary Public

My Commission Expires: 7-11-2016

MARY ILA MACFARLANE
NOTARY PUBLIC, STATE OF COLORADO
My Comm. Expires July 11, 2016

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 2nd day of September, 2014, the foregoing document was

served on the following, via first class mail:


Lisa J. Stevenson,
Deputy General Counsel – Law
Federal Election Commission
999 E Street, N.W.
Washington, D.C. 20436
Phone: 202.694.1650
Facsimile: 202.219.0260

*Counsel for Defendant, FEC*

Nancy Erickson
Secretary of the Senate
United States Senate
Washington, D.C. 20510-6601


Civil Process Clerk
U.S. Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530

Eric H. Holder,
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530




Karen L. Haas
Clerk of the House of Representatives
U.S. House of Representatives
U.S. Capitol, Room H154
Washington, D.C. 20515-6601


s/ Allen Dickerson
Allen Dickerson