**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

INDEPENDENCE INSTITUTE,
a Colorado nonprofit corporation,

      Plaintiff,

          v.                             Case No. 1:14-cv-1500-CKK-PAM-APM

FEDERAL ELECTION COMMISSION,

      Defendant.

**INDEPENDENCE INSTITUTE'S MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM IN SUPPORT**

Allen Dickerson (D.C. Bar No. 1003781)
Tyler Martinez (D.C. Bar No. 1022937)

Center for Competitive Politics
124 S. West Street, Suite 201
Alexandria, Virginia 22314
Telephone: 703.894.6800
Facsimile: 703.894.6811
adickerson@campaignfreedom.org
tmartinez@campaignfreedom.org

*Counsel for Plaintiff
Independence Institute*

Dated: June 17, 2016

# Table of Contents

Table of Authorities ....................................................................................................... iii

Introduction .......................................................................................................................1

Statement of the Case .......................................................................................................1

Summary of the Argument ................................................................................................6

Argument ...........................................................................................................................8

    I.       BCRA imposes burdensome disclosure and reporting requirements. ..........................8

    II.      The violations of associational privacy and chilling of issue speech imposed by BCRA's compelled disclosure regime require this Court's exacting scrutiny. ..........11

        a.   Exacting Scrutiny as a Protection for Issue Speech and Associational Privacy ....11

        b.   Under *Buckley*'s exacting scrutiny, the government's only legitimate interest is informational, and that interest extends only to speech that is "unambiguously campaign related." ..............................................................................................13

    III.    BCRA's electioneering communication reporting and disclosure regime is insufficiently tailored as applied to the genuine issue speech of a § 501(c)(3) organization ............................................................................................................17

        a.   Congress and the Courts treat § 501(c)(3) organizations differently than § 501(c)(4) organizations. ....................................................................................18

        b.   Due to the difference in tax status, the work of Citizens United differs significantly from the Independence Institute's proposed ad. .............................21

    IV.    BCRA's electioneering communications definition and disclosure regulations unconstitutionally burden the rights of the Independence Institute and its supporters to freedom of speech and association. ......................................................................26

        a.   The Supreme Court has consistently required that burdens on issue speech meet the tailoring requirements of exacting scrutiny, a trend that extends to *Citizens United* ..................................................................................................................26

        b.   *WRTL II* and *Citizens United* show that the government has only a limited interest. ............................................................................................................33

    V.     Ruling in favor of the Institute and its activity keeps BCRA intact while properly limiting its reach to unambiguously campaign-related speech. ...................................38

VI.     The Independence Institute's challenge is not moot because it intends to run
        substantively similar ads in the future. ........................................................................39

Conclusion ........................................................................................................................42

# Table of Authorities

**Cases**

*Am. Meat Inst. v. United States Dep't of Agric.*,
  760 F.3d 18 (D.C. Cir. 2014) ..........................................................................................35

*Bates v. City of Little Rock*,
  361 U.S. 516 (1960) ...................................................................................6, 12, 13, 26, 27

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ................................................................................................... *passim.*

*Buckley v. Valeo*,
  519 F.2d 821 (D.C. Cir. 1975) ...................................................................................7, 28

*Cao v. FEC*,
  688 F. Supp. 2d 498 (E.D. La. 2010) ............................................................................16

*Cent. Hudson Gas & Elec. v. Public Serv. Comm'n*,
  447 U.S. 557 (1980) .......................................................................................................35

*Ctr. for Individual Freedom v. Van Hollen*,
  694 F.3d 108 (D.C. Cir. 2012) .........................................................................................9

*Citizens United v. FEC*,
  558 U.S. 310 (2010) ................................................................................................ *passim.*

*Citizens United v. FEC*,
  530 F.Supp. 2d 274 (D.D.C. 2008) ..............................................................22, 31, 34, 35

*Citizens United v. Gessler*,
  773 F.3d 200 (10th Cir. 2014) .......................................................................................23

*Council of the Dist. of Columbia v. Gray*,
  42 F. Supp. 3d 134 (D.D.C. 2014) .................................................................................40

*Council of the Dist. of Columbia v. Gray*,
  No. 14-7067, 2015 U.S. App. LEXIS 8881 (D.C. Cir. May 27, 2015) ...........................40

*FEC v. Wis. Right to Life, Inc.*,
  551 U.S. 449 (2007) ................................................................................................ *passim.*

*First Nat'l Bank v. Bellotti*,
  435 U.S. 765 (1978) .......................................................................................................11

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)..................................................................................................39

*Holmes v. FEC*,
    99 F. Supp. 3d 123 (D.D.C. 2015) ....................................................................40, 41

*Indep. Inst. v. Coffman*,
    209 P.3d 1130 (Colo. Ct. App. 2008) ......................................................................25

*Indep. Inst. v. FEC*,
    816 F.3d 113 (D.C. Cir. 2016) ...........................................................5, 6, 17, 21, 41

*Indep. Inst. v. FEC*,
    No. 14-5249, Order (D.C. Cir. Oct. 13, 2015) (Doc. No. 1577832)..................................41

*Indep. Inst. v. FEC*,
    70 F. Supp. 3d 502 (D.D.C. 2014) .............................................................................4

*Indep. Inst. v. Williams*,
    812 F.3d 787 (10th Cir. 2016) ...................................................................................16

*Lovell v. City of Griffin*,
    303 U.S. 444 (1938).....................................................................................................33

*McConnell v. FEC*,
    540 U.S. 93 (2003)...................................................................7, 12, 14, 15, 29, 38, 39

*McConnell v. FEC*,
    251 F. Supp. 2d 176 (D.D.C. 2003) ..........................................................................14

*McCutcheon v. FEC*,
    572 U.S. ___, 134 S. Ct. 1434 (2014) ....................................................................7, 16

*Mills v. Alabama*,
    384 U.S. 214 (1966)....................................................................................................11

*Moore v. Hosemann*,
    591 F.3d 741 (5th Cir. 2009) .....................................................................................40

*NAACP v. Ala.*,
    357 U.S. 449 (1958).............................................................................6, 11, 12, 13, 26

*NAACP v. Button*,
    371 U.S. 415 (1963)..............................................................................................12, 27

*Nat'l Ass'n of Mfrs. v. SEC*,
    800 F.3d 518 (D.C. Cir. 2015) ....................................................35

*Nat'l Org. for Marriage v. McKee*,
    649 F.3d 34 (1st Cir. 2011) ......................................................39

*Nat'l Right to Work Legal Def. and Ed. Found. v. Herbert*,
    581 F. Supp. 2d 1132 (D. Utah 2008) ......................................16

*N.M. Youth Organized v. Herrera*,
    611 F.3d 669 (10th Cir. 2010) .............................................. 15-16

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ...................................................................11

*N.C. Right to Life, Inc. v. Leake*,
    525 F.3d 274 (4th Cir. 2008) .....................................................15

*Regan v. Taxation with Representation*,
    461 U.S. 540 (1983) ...................................................................18

*R.J. Reynolds Tobacco Co. v. FDA*,
    696 F.3d 1205 (D.C. Cir. 2012) ................................................35

*Shays v. FEC*,
    337 F. Supp. 2d 28 (D.D.C. 2004) ...........................................21

*Shays v. FEC*,
    414 F.3d 76 (D.C. Cir. 2005) ....................................................21

*United States v. Williams*,
    553 U.S. 285 (2008) ...................................................................35

*Unity08 v. FEC*,
    596 F.3d 861 (D.C. Cir. 2010) ..................................................41

*Van Hollen v. FEC*,
    851 F. Supp. 2d 69 (D.D.C. 2012) .............................................9

*Van Hollen v. FEC*,
    74 F. Supp. 3d 407 (D.D.C. 2014) ..........................................4, 9

*Van Hollen v. FEC*,
    811 F.3d 486 (D.C. Cir. 2016) ....................................................9

*Wash. Post v. Robinson*,
    935 F.2d 282 (D.C. Cir. 1991) ......................................................................40

*Wisc. Right to Life v. Barland*,
    751 F.3d 804 (7th Cir. 2014) ..............................................................15, 16

**Statutes**

26 U.S.C. § 170(c)(2) ....................................................................................18

26 U.S.C. § 501(c)(3) ..................................................................2, 18, 19, 22

26 U.S.C. § 501(c)(4) ....................................................................................22

26 U.S.C. § 501(h) ..................................................................................19, 24

26 U.S.C. § 501(h)(2)(B) ..............................................................................23

26 U.S.C. § 501(h)(2)(D) ..............................................................................23

26 U.S.C. § 4911(c)(2) ..................................................................................23

26 U.S.C. § 4911(c)(4) ..................................................................................23

26 U.S.C. § 6104(b) ......................................................................................10

26 U.S.C. § 6104(c)(3) ..................................................................................19

26 U.S.C. § 6104(d)(3)(A) ............................................................................19

28 U.S.C. § 2284 ............................................................................................4

28 U.S.C. § 2284 (a-b) ....................................................................................4

52 U.S.C. § 30101(11) ....................................................................................9

52 U.S.C. § 30104(f) ........................................................................3, 6, 42

52 U.S.C. § 30104(f)(1) ................................................................................10

52 U.S.C. § 30104(f)(2)(E) ..............................................................................9

52 U.S.C. § 30104(f)(2)(F) ..............................................................................9

52 U.S.C. § 30104(f)(3)(A)(i)(I) ......................................................................9

52 U.S.C. § 30104(f)(3)(A)(i)(II) ............................................................................9

52 U.S.C. § 30104(f)(3)(A)(i)(III) ...........................................................................9

52 U.S.C. § 30104(f)(3)(A)(ii) ...............................................................................38

52 U.S.C. § 30104(f)(3)(C) ......................................................................................9

52 U.S.C. § 30104(f)(4) .........................................................................................10

52 U.S.C. § 30104(f)(7) .........................................................................................21

52 U.S.C. § 30110 note ............................................................................................3

52 U.S.C. § 30111(f) .............................................................................................20

Bipartisan Campaign Reform Act of 2002,
    Pub. L. 107-155, 116 Stat. 81 (2002)................................................................1

## Rules

Fed. R. Civ. P. 56 ......................................................................................................1

Fed. R. Evid. 201(c) ................................................................................................40

D.D.C. Rule LCvR 7(h) ............................................................................................1

11 C.F.R. § 100.29(c)(6) ........................................................................................21

11 C.F.R. § 104.20(b) .............................................................................................10

11 C.F.R. § 104.20(c)(9) ....................................................................................9, 10

26 C.F.R. § 1.501(c)(3)-1(a)(3)(i) .........................................................................18

26 C.F.R. § 1.501(c)(3)-1(a)(3)(ii) ........................................................................19

26 C.F.R. § 1.501 (c)(3)-1(b)(2) ............................................................................20

26 C.F.R. § 1.501(c)(3)-1(b)(3) .............................................................................20

26 C.F.R. 1.501(c)(3)-1(c)(3)(ii)(b) .......................................................................23

26 C.F.R. § 1.501(c)(3)-1(c)(3)(iii) ..................................................................20, 23

26 C.F.R. § 1.501(c)(3)-1(c)(3)(v)...................................................................................19

26 C.F.R. § 1.501(c)(3)-1(d)(3)(i)(b)..........................................................................19, 23

26 C.F.R. § 1.501(c)(3)-1(d)(3)(ii) ..............................................................................23

26 C.F.R. § 1.501(c)(3)-1(c)(3)(ii)(b)...........................................................................23

26 C.F.R. § 1.501(c)(4)-1(a)(2)(i)..................................................................................20

26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii)................................................................................20

IRS Rev. Rul. 2007-41, 2007-25 I.R.B. 1420...............................................................20


**Other Sources**

*CREW et al. v. FEC*, No. 15-2038, Compl. (D.D.C. Nov. 23, 2015) (ECF 1) ...........................25

CREW, Complaints Against American Dream Initiative, Arizona Future Fund, Jobs and Progress
        Fund, Inc., Michigan Citizens for Fiscal Responsibility, Mid America Fund, Inc., and
        Rule of Law Project, at 4 (June 15, 2016), *available at*
        http://www.citizensforethics.org/page/-/PDFs/Omnibus%20DOJ%20complaint%206-15-
        16.pdf ...............................................................................................................25

CREW, Press: "CREW Files Criminal, IRS Complaints Against 10 Dark Money Groups"
        http://www.citizensforethics.org/press/entry/crew-files-criminal-irs-complaints-against-
        10-dark-money-groups......................................................................................25

*Citizens United v. FEC*, No. 07-2240, FEC Mem. of L. in Supp. of Mot. for Summ. J.
        (D.D.C. June 6, 2008) (ECF 55) .....................................................................22

FEC, Electioneering Communications Explanation and Justification,
        67 Fed. Reg. 65190 (Oct. 23, 2002)................................................................21

George W. Bush, Statement on Signing the Bipartisan Campaign Reform Act
        (March 27, 2002) http://www.presidency.ucsb.edu/ws/?pid=64503 ................................38

*Indep. Inst. v. FEC*, No. 14-5249, Ans. Br. (D.C. Cir. May 8, 2015) (Doc. No. 1551586)...........40

*Indep. Inst. v. FEC*, No. 14-5249, Reply Br. (D.C. Cir. May 22, 2015) (Doc. No. 1553771) ......40

*Indep. Inst. v. FEC*, No. 14-5249, Mot. to Supp. (D.C. Cir. Sept. 24, 2015)
        (Doc. No. 1574833) ...........................................................................................5

INTERNAL REVENUE SERVICE, Social Welfare Organizations, http://www.irs.gov/Charities-&-
Non-Profits/Other-Non-Profits/Social-Welfare-Organizations ........................................18

Oral Argument, *Indep. Inst. v. FEC*, No. 14-5249 (D.C. Cir. Oct. 22, 2015)
https://www.cadc.uscourts.gov/recordings/recordings2016.nsf/638E93666D13933685257
EE60058FB78/$file/14-5249.mp3.............................................................................5, 41

*Van Hollen v. FEC*, Nos. 15-5016 & 15-5017, Appellee Pet. for Rehearing En Banc, (D.C. Cir.
Mar 4, 2016) (Doc. No. 1602481) ....................................................................................9

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule LCvR 7(h) of this Court, Plaintiff Independence Institute submits this Motion for Summary Judgment and Memorandum in Support.

## Introduction

This case asks whether a communication that in no way "electioneers" may nevertheless be labeled an "electioneering communication" and regulated as such.

The Independence Institute—a well-established Colorado think tank—wished to produce an advertisement asking Colorado's senators to take action concerning federal sentencing reform. The proposed advertisement takes no position whatsoever on either senator as a political candidate, and in fact makes no reference to any candidacy. Nor, as a § 501(c)(3) charity, is the Institute permitted to intervene in any candidate election—something which the relevant tax laws recognize this advertisement does not do. Nevertheless, the Bipartisan Campaign Reform Act of 2002, Pub. L. 107-155, 116 Stat. 81 (2002) ("BCRA"), would classify this issue speech as an "electioneering communication," forcing the Institute to file reports requiring, among other things, that it publically identify its donors.

Because, in the context of this case, BCRA's electioneering communications requirement will burden the First Amendment rights of the Institute and its supporters, while providing the electorate with no relevant information concerning those who support or oppose any candidate for office, summary judgment is appropriate.

## Statement of the Case

Plaintiff Independence Institute ("Institute") is a Colorado-based nonprofit corporation organized under § 501(c)(3) of the Internal Revenue Code and Colorado law. Undisputed Fact ¶¶ 1-2. Established in 1985, the Institute has a long history of conducting research and educating the public on various aspects of public policy, including taxation, education, health care, and criminal

justice. *Id* at ¶ 1. As a § 501(c)(3) entity, the Institute cannot "participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3).

To further its mission, in 2014, the Institute wished to run a radio advertisement supporting the Justice Safety Valve Act, a draft law that would allow federal judges substantial discretion in sentencing nonviolent offenders. The ad would urge viewers to contact both of Colorado's sitting senators and express support for the Act, which was pending before the U.S. Senate. One of Colorado's senators, Mark Udall, also happened to be a candidate for reelection. The proposed ad did not discuss or refer to Udall's candidacy in any way.[1] Nevertheless, the Institute's proposed ad would qualify as an electioneering communication under the Bipartisan Campaign Reform Act ("BCRA"), because it mentioned Udall's name within 60 days of the November 2, 2014 general election.

The text of the proposed advertisement is as follows:

*Independence Institute*
*Radio :60*
*"Let the punishment fit the crime"*

Let the punishment fit the crime.

But for many federal crimes, that's no longer true.

Unfair laws tie the hands of judges, with huge increases in prison costs that help drive up the debt.

And for what purpose?

Studies show that these laws don't cut crime.

---

[1] When the Independence Institute first brought the challenge in 2014, the proposed ad mentioned both Colorado Senators Udall and Bennett. At the time, Senator Udall was a candidate seeking reelection, in which he was unsuccessful. Now, Senator *Bennett* is up for reelection, and the Justice Safety Valve Act remains under consideration by Congress, as S. 353.

In fact, the soaring costs from these laws make it harder to prosecute and lock up violent felons.

Fortunately, there is a bipartisan bill to help fix the problem – the Justice Safety Valve Act, bill number S. 619.

It would allow judges to keep the public safe, provide rehabilitation, and deter others from committing crimes.

Call Senators Michael Bennet and Mark Udall at 202-224-3121. Tell them to support S. 619, the Justice Safety Valve Act.

Tell them it's time to let the punishment fit the crime.

Paid for by Independence Institute, I2I dot org. Not authorized by any candidate or candidate's committee. Independence Institute is responsible for the content of this advertising.

Because this radio communication would cost more than $10,000 and reach over 50,000 natural persons in the Denver media market, it triggers BCRA's disclosure requirements for electioneering communications. Undisputed Fact ¶ 4; 52 U.S.C. § 30104(f).

Mindful of its supporters' First Amendment right to private association, the Institute does not wish to report and disclose its donors and, as it is not engaged in political electioneering, does not believe it may constitutionally be required to do so. Consequently, the Independence Institute faces a dilemma: it may remain silent on issues important to its mission, or it may speak on the issue of federal sentencing guidelines, but only at the price of imposing a First Amendment harm upon its supporters. Accordingly, the Institute chose to file suit.

As a challenge to part of BCRA, this case is brought pursuant to an unusual procedure that was established by Congress in order to ensure the rapid review of constitutional questions raised by that law. 52 U.S.C. § 30110 note ("It shall be the duty of the United States District Court for the District of Columbia and the Supreme Court of the United States…to expedite to the greatest possible extent the disposition of the appeal"). This statute provides that challenges to a provision

of BCRA "shall be filed in the United States District Court for the District of Columbia…and shall be heard by a 3-judge court" pursuant to 28 U.S.C. § 2284. *Id.* Despite the mandatory and expeditious nature of this language—and despite the fact that this case has been briefed twice before an appellate court—this is the first time that the merits of this First Amendment challenge will be reached by a three-judge court as required by the Congress.

On September 2, 2014, the Institute filed a verified complaint and motion to convene "a district court of three judges." 28 U.S.C. § 2284 (a-b), (ECF 1, ECF 3). Given the proximity of the electioneering communications period for the 2014 election, the Institute moved for preliminary relief two days later. (ECF 4).

This Court held a telephonic conference with the Parties, and shortly thereafter the Parties agreed to stipulate as to the scope of Plaintiff's allegations and claims and to convert the Institute's motion for preliminary relief into a motion for summary judgment. (ECF 14). The motion was fully briefed, and on October 6, 2014, this Court denied the Institute's Application for a Three-Judge Court, finding that "Plaintiff's claims are foreclosed by clear United States Supreme Court precedent, principally by *Citizens United v. Federal Election Commission,*" and denied injunctive relief as moot. (ECF 23); *Indep. Inst. v. FEC,* 70 F. Supp. 3d 502, 503 (D.D.C. 2014).

The Institute timely appealed, and the FEC moved for summary affirmance. The Institute responded and cross-moved for summary reversal, on the grounds that this Court's November 25, 2014 decision invalidating an FEC regulation which placed moderate limits on BCRA's disclosure provisions, *Van Hollen v. FEC*, 74 F. Supp. 3d 407 (D.D.C. 2014), materially altered this Court's reasoning for denying the assembly of a three-judge court. On February 20, 2015, the D.C. Circuit denied both motions for summary relief. The Parties fully briefed the Institute's appeal from denial of its application and the Court of Appeals scheduled oral argument for October 22, 2015.

In its Answering Brief, despite having earlier conceded (in its motion for summary affirmance) that the Independence Institute's challenge remained live after passage of the 2014 election, the FEC argued for the first time that Plaintiff's case had been mooted by that event. The Institute moved to supplement the record with a press release it issued "on November 3, 2014 that conclusively demonstrate[d]" the Institute's "intention, in future years, to run substantively similar advertisements to the one at issue here." Mot. to Supp. at 2, *Indep. Inst. v. FEC*, No. 14-5249(D.C. Cir. 2016) (Doc. No. 1574833). Although the FEC opposed the motion, once it was granted by the Court of Appeals the FEC abandoned its mootness objection before the Court at oral argument. Oral Argument at 24:53, *Indep. Inst. v. FEC*, No. 14-5249 (D.C. Cir. Oct. 22, 2015).[2]

On March 1, 2016, the D.C. Circuit reversed this Court and remanded with instructions to convene a three-judge court "[b]ecause Independence Institute's complaint raises a First Amendment challenge to a provision of BCRA," and it was therefore "entitle[d]…to a three-judge district court." *Indep. Inst. v. FEC*, 816 F.3d 113, 115-16 (D.C. Cir. 2016). The mandate issued nearly two months later, on April 26, 2016. In response, a three-judge Court was promptly convened. (ECF 28-30).

Now, with the 2016 elections approaching, this Court may finally hear and reach the merits of this novel case, concerning which there is "no precedent from the Supreme Court (or any other court) rejecting the argument advanced here by Independence Institute." *Indep. Inst.,* 816 F.3d at 117.

---

[2] *Available at:*
https://www.cadc.uscourts.gov/recordings/recordings2016.nsf/638E93666D13933685257EE600 58FB78/$file/14-5249.mp3

**Summary of the Argument**

Under BCRA, communications that do not in any way "electioneer" nevertheless are regulated as "electioneering communications." The law requires that, upon any mention of a candidate by name in a broadcast ad shortly before an election, an entity must report to the FEC and disclose certain of its donors. 52 U.S.C. § 30104(f). Genuine issue speech is not exempted or otherwise protected from this mandate.

The Independence Institute, a § 501(c)(3) organization prohibited by Federal law from intervention in political campaigns, merely seeks to encourage the people of Colorado to ask that the state's senators support a criminal justice reform provision. *FEC v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 461 (2007) ("*WRTL II*") (describing similar communication as a "genuine issue ad"). But, because of BCRA, it cannot do so without reporting to the Federal Election Commission and disgorging the names and addresses of certain donors for publication.

The Supreme Court has long recognized that such compelled disclosure threatens "the right of [citizens]…to pursue their lawful private interests privately and to associate freely with others in so doing." *NAACP v. Ala.*, 357 U.S. 449, 466 (1958). This freedom is protected "not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference" such as disclosure requirements and attendant sanctions for failing to disclose. *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960) (collecting cases). Accordingly, the "significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest," but "must survive exacting scrutiny." *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (per curiam) (citing to *NAACP*, 357 U.S. at 463). This "strict test," *Buckley*, 424 U.S. at 66, prohibits disclosure laws from reaching

"groups that do no more than discuss issues of public interest on a wholly nonpartisan basis." *Buckley v. Valeo*, 519 F.2d 821, 872 (D.C. Cir. 1975) (en banc).

In the context of BCRA, it has been established that exacting scrutiny requires that the government demonstrate "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Citizens United v. FEC*, 558 U.S. 310, 366-367 (2010) (internal quotation marks omitted) (citing *Buckley*, 424 U.S. at 64). Specifically, if the FEC cannot demonstrate that the disclosure of the Institute's donors offers the electorate information about "spending that is unambiguously related to the campaign of a particular federal candidate," BCRA's disclosure regime is unconstitutional as applied to the Institute. *Buckley*, 424 U.S. at 80; *McCutcheon v. FEC*, 572 U.S. ___, ___,134 S. Ct. 1434, 1456 (2014) ("[I]n the First Amendment context, fit matters").

BCRA flunks this tailoring analysis as applied to the Institute's genuine issue speech for a number of reasons. First, while the government has an interest in providing the public with knowledge about "who is speaking about a candidate shortly before an election," *Citizens United*, 558 U.S. at 369, that interest only applies to speech that is unambiguously related to a campaign. *Buckley*, 424 U.S. at 66-67. The Institute's proposed ad does nothing more than ask for citizens to encourage their U.S. senators—one of whom was not even a candidate—to take official action. It is not "unambiguously campaign related." *Buckley*, 424 U.S. at 81. No Supreme Court case, even *McConnell v. FEC*, 540 U.S. 93 (2003) or *Citizens United*, has upheld donor disclosure for genuine issue speech of this type.

Second, the Institute is a § 501(c)(3) organization carrying out traditional and lawful § 501(c)(3) activity. Unlike Citizens United which, as was its right, was actively seeking to prevent Hillary Clinton from being nominated by the Democratic Party as a candidate in 2008 and speaking

"pejorative[ly]" about her to that end, the Institute's genuine issue ad takes no position—even by hint or implication—on the "character, qualifications, or fitness for office" of either Senator Udall or Senator Bennet. *Citizens United*, 558 U.S. at 320; *WRTL II*, 551 U.S. at 470 (Roberts, C.J., controlling opinion). Since § 501(c)(3) organizations are prohibited from candidate advocacy, the government's interest in the identity of donors to such groups is minimal or nonexistent. Both Congress and the courts have recognized that § 501(c)(3) organizations occupy a special place in civil society's firmament, and have structured the law to protect § 501(c)(3) donors from publication. That BCRA applies against a lawful § 501(c)(3) communication demonstrates its overbreadth.

Protecting the Institute's genuine issue speech from triggering registration and disclosure will not upset or upend the ordinary enforcement of the campaign finance laws. BCRA's electioneering communication definition contains a "backup" definition drafted by Congress in the event of a case such as this one. That definition captures speech that promotes, attacks, supports, or opposes particular candidates for office—a standard that has already been approved by the Supreme Court.

Put simply, the Institute ought to be free to educate the public about public policy without having to violate the privacy of private citizens, and it should not have to adopt the burdens of federal disclosure as an entity making "electioneering communications" when it does not "electioneer," especially where—as a § 501(c)(3) charity—it is prohibited from doing so.

## Argument

### I.      BCRA imposes burdensome disclosure and reporting requirements.

BCRA defines electioneering communications as "any broadcast, cable, or satellite communication" that "refers to a clearly identified candidate for Federal office" and is made either within 60 days of a general election or 30 days before a primary election. 52 U.S.C. §

30104(f)(3)(A)(i)(I)-(II). The ad must also be "targeted to the relevant electorate," 52 U.S.C.

§ 30104(f)(3)(A)(i)(III), meaning in practice that it "can be received by 50,000 or more persons"

in the relevant jurisdiction. 52 U.S.C. § 30104(f)(3)(C).

Once triggered, BCRA's electioneering communication disclosure system is burdensome:

the law forces speakers, whether they are individuals, organizations, unions, or any other type of

group, to reveal the names and addresses of donors who give $1,000 or more. 52 U.S.C.

§§ 30101(11), 30104(f)(2)(E), and 30104(f)(2)(F).[3] Such as yoke is heavy for most organizations

---

[3] The report requires the name and address of anyone who gives more than $1,000 for an electioneering communication—if the funds to pay for the electioneering communication came out of a special, segregated account described in 52 U.S.C. § 30104(f)(2)(E). But if the funds used to pay for the electioneering communication came from an account not described in 52 U.S.C. § 30104(f)(2)(E), then "the names and addresses of *all contributors* who contributed an aggregate amount of $1,000 or more to the person" must be disclosed. 52 U.S.C. § 30104(f)(2)(F) (emphasis added).

While the FEC has interpreted BCRA disclosure under 52 U.S.C. § 30104(f)(2)(E) as limited to donations *earmarked* for electioneering communications, 11 C.F.R. § 104.20(c)(9), the status of the earmarking regulation is uncertain and unreliable because of the Commission's refusal to defend it. The Commission failed to appeal when the district court in *Van Hollen v. FEC*, 851 F. Supp. 2d 69, 89 (D.D.C. 2012), struck it down, and the regulation was saved temporarily when the D.C. Circuit ruled for intervenors and ordered that the FEC consider a proposed rulemaking to clarify the justification of the rule or that the district court—absent a new rulemaking—perform a *Chevron* step two analysis, *Ctr. for Individual Freedom v. Van Hollen*, 694 F.3d 108, 110, 112 (D.C. Cir. 2012). The FEC failed to perform a rulemaking to save the rule, and the district court held that the rule did not survive *Chevron* step two and was arbitrary and capricious. *Van Hollen v. FEC*, 74 F. Supp. 3d 407, 413, 435 (D.D.C. 2014). The D.C. Circuit again overruled the district court, holding that the rule survived *Chevron* and was not arbitrary and capricious, *Van Hollen v. FEC*, 811 F.3d 486, 488-89 (D.C. Cir. 2016), but Rep. Van Hollen is now seeking *en banc* review, *see Van Hollen v. FEC*, Nos. 15-5016 & 15-5017, Appellee Pet. for Rehearing En Banc, (D.C. Cir. Mar 4, 2016) (Doc. No. 1602481).

Here, both the FEC and *amici* have relied, in part, on this regulation in asserting that BCRA is properly tailored. FEC Opp. to Mot. for Prelim. Inj.at 7-8 (ECF 19); *id.* at 33-34; *see also* Campaign Legal Center, et al. *Amici Curiae* Br. in Opp. to Mot. for Prelim. Inj. at 23-24 (ECF 21). But *amici* assert that "the statute itself does not limit donor disclosure to earmarked contributions." *Amici* Br. at 24. Thus this case requires proper analysis of BCRA's tailoring to the facts of this as-applied challenge.

At the very best, if it stays in effect, 11 C.F.R. § 104.20(c)(9) would lessen the impact of BCRA on the Institute, though mandated reporting and the disclosure of any donor to a 501(c)(3) is

to bear. *Cf. Citizens United*, 558 U.S. at 354 (recognizing that most organizations to which such regulations apply are small). It is particularly pernicious to the subset of § 501(c)(3) organizations, however, whose donors are usually protected from public disclosure by case law and the Internal Revenue Code. 26 U.S.C. § 6104(b).

Moreover, once an organization has hit the trigger of spending more than $10,000 on qualifying communications, 52 U.S.C. § 30104(f)(1), the organization must file its report within approximately 24 hours of the disbursement of funds. 52 U.S.C. § 30104(f)(1); 52 U.S.C. § 30104(f)(4) (defining "disclosure date" as "the first date during any calendar year by which a person has made [qualifying] disbursements for . . . electioneering communications . . . ; and any other date during such calendar year by which a person has made [qualifying] disbursements for . . . electioneering communications . . . since the most recent disclosure date for such calendar year"); *but see* 11 C.F.R. § 104.20(b) ("[e]very person who has made an electioneering communication, as defined in 11 C.F.R. 100.29 . . . shall file a statement with the Commission by 11:59 p.m. Eastern Standard/Daylight Time on the day following the disclosure date").

Thus, the Independence Institute is left with an unconstitutional choice: either stay silent on issues important to its mission or violate the privacy rights of its donors and comply with heavy administrative burdens.

---

sufficient harm. Nevertheless, the Commission's reluctant defense of its own regulations leaves an organization facing the very real possibility of being required to disclose *all* of its donors, should it disseminate an electioneering communication. In that event, the Institute believes the harm to it and its donors would necessarily increase, and the relevant exacting scrutiny analysis tilt even further in its direction. It preserves that and related arguments in the event 11 C.F.R. § 104.20(c)(9) ceases to remain in effect.

## II.   The violations of associational privacy and chilling of issue speech imposed by BCRA's compelled disclosure regime require this Court's exacting scrutiny.

### a.   Exacting Scrutiny as a Protection for Issue Speech and Associational Privacy

As applied here, BCRA violates two separate but related constitutionally-protected rights: donors' rights to associational privacy and the right to debate public policy and issues. The Supreme Court has long limited governmental intrusions on these rights by requiring that such intrusions meet exacting scrutiny. That is, as shown by cases extending from *NAACP v. Alabama* to *Citizens United*, the government must show that such laws serve an important government interest and that there be a substantial relation between that interest and the burdens placed on citizens' rights.

The Supreme Court has noted that "'there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs.'" *Buckley*, 424 U.S. at 14 (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)). That is because "'[t]he freedom of speech . . . guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment.'" *WRTL II*, 551 U.S. at 469 (Roberts, C.J., controlling opinion) (quoting *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 776 (1978)) (ellipsis in *WRTL II*, brackets added). These principles reflect the "'national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Buckley*, 424 U.S. at 14 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

The Supreme Court has also emphasized that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," and that there is a "vital relationship between freedom to associate and privacy in one's associations." *NAACP*, 357 U.S. at 460-61, 462.This language recognizes two rights: to

11

engage in debate concerning public policies and issues, and to effectual that right, to associational privacy. Furthermore, freedom of association must be protected "not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference" such as registration and disclosure requirements and the attendant sanctions for failing to disclose. *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960); *see also NAACP v. Button*, 371 U.S. 415, 433 (1963) (noting that the freedoms of speech and association are "delicate and vulnerable" to "[t]he threat of sanctions [which] may deter their exercise almost as potently as the actual application of sanctions").

In *NAACP v. Alabama*, the Supreme Court protected the right to privacy of association— there from disclosure of an organization's contributors—by subjecting "state action which may have the effect of curtailing the freedom to associate . . . to the closest scrutiny." 357 U.S. at 460-61; *see also id*. at 462 (noting that "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute a[n] effective . . . restraint on freedom of association . . . .").

In *Buckley v. Valeo*, the Supreme Court directly addressed both the associational rights discussed in *NAACP v. Alabama* and the "[d]iscussion of public issues"—now referred to as "issue advocacy" or "issue speech."[4] 424 U.S. at 14. The Court there confronted a statute that "require[d] direct disclosure of what an individual or group contributes or spends." *Id*. at 75. The Court stated, "[i]n considering this provision we must apply the same strict standard of scrutiny, for the right of associational privacy developed in *NAACP v. Alabama* derives from the rights of the organization's members to advocate their personal points of view in the most effective way." *Id*.; *see also id*. at 66 (noting "[t]he strict test established by *NAACP v. Alabama* is necessary because

---

[4] *See*, *e.g., McConnell*, 540 U.S. at 190.

compelled disclosure has the potential for substantially infringing the exercise of First Amendment rights").

Thus, the Court required that "that the subordinating interests of the State . . . survive exacting scrutiny." *Buckley*, 424 U.S. at 64 (footnote omitted, collecting cases). And, under exacting scrutiny, the Supreme Court "insisted that there be a 'relevant correlation' or 'substantial relation' between the governmental interest and the information to be disclosed." *Id.* (quoting *NAACP*, 357 U.S. at 463; *Bates*, 361 U.S. at 525).

In the almost 60 years since *NAACP v. Alabama* and the 40 years since *Buckley*, the right to engage in issue speech and the right to associate—and to associate privately—to more effectively debate policies and issues have neither changed nor diminished. Rather, as the Supreme Court recently held in *Citizens United*, laws that burden these fundamental rights must continue to meet "'exacting scrutiny,' which requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." 558 U.S. at 366-67 (quoting *Buckley*, 424 U.S. at 64, 66).

> **b. Under *Buckley*'s exacting scrutiny, the government's only legitimate interest is informational, and that interest extends only to speech that is "unambiguously campaign related."**

As explained in both *Buckley* and *Citizens United*, the only interest that the government can assert to justify its disclosure requirements is the informational interest. *Buckley*, 424 U.S. at 81; *Citizens United*, 558 U.S. at367. The informational interest does not justify any government regulation that provides some information to the government or the public. The informational interest is not even an interest in any information about politics or candidates. The government tried to obtain such broad information in *Buckley*, attempting "to achieve 'total disclosure' by reaching 'every kind of political activity' in order to insure that the voters are fully informed and

to achieve through publicity the maximum deterrence to corruption and undue influence possible." *Id*. at 76 (citations omitted). The *Buckley* Court recognized, however, that these broad aims coupled with vague provisions engendered the "potential for encompassing both issue discussion and advocacy of a political result," thus "reach[ing] groups engaged purely in issue discussion." *Id*. at 79.

Rather, in applying exacting scrutiny, the Supreme Court approved only a limited reach for the informational interest against which a disclosure regime must be measured: disclosure must "increase[] the fund of information concerning those who support the candidates," thus "defin[ing] more of the candidate's constituencies." *Id*. at 81. From the overly broad and vague statute before it, the Court constructed a "disclosure requirement [that was] narrowly limited to those situations where the information sought has a substantial connection with the governmental interests sought to be advanced." *Id*. at 81. That is, the Supreme Court limited disclosure to "expenditures for communications that expressly advocate the election or defeat of a clearly identified candidate" because the government's informational interest extended only to "spending that is unambiguously campaign related," *Id*. at 80-81.

This interest and its limited reach has not changed since *Buckley*, as demonstrated by the Supreme Court's decisions in *McConnell* and *Citizens United*. In *McConnell*, the record was replete with examples of "candidate advertisements masquerading as issue ads." 540 U.S. at 132 (citation and quotation marks omitted). Based on that record, the Court upheld BCRA against a facial challenge, concluding that the law targeted the informational interest because it "require[d] organizations to reveal their identities so that the public is able to identify the source of the funding behind broadcast advertisements influencing certain elections." *Id*. at 196 (quoting *McConnell v. FEC*, 251 F. Supp. 2d 176, 237 (D.D.C. 2003) (op. of Kollar-Kotelly, J.)).

Similarly, the *Citizens United* Court explained that "disclosure could be justified based on a governmental interest in 'provid[ing] the electorate with information' about the sources of election-related spending." *Citizens United*, 558 U.S. at 367 (quoting *Buckley*, 424 U.S. at 66)). Then, analyzing BCRA's disclaimer requirements as-applied to Citizens United's "pejorative" ads, the Court held that the requirements "'provid[ed] the electorate with information,' *McConnell*, [540 U.S.] at 196 . . . , and 'insure[d] that the voters [were] fully informed' about the person or group who is speaking." *Citizens United*, 558 U.S. at 368 (citing *Buckley*, 424 U.S. at 76).[5]

The decisions of other federal courts implementing this standard underscore that the informational interest extends only to providing information about who is supporting or opposing candidates, or about "spending that is unambiguously campaign related." *Buckley*, 424 U.S. at 80-81. For example, in *Wisconsin Right to Life, Inc. v. Barland*, the Seventh Circuit stated that "[t]o protect against an unconstitutional chill on issue advocacy by independent speakers, *Buckley* held that campaign-finance regulation must be precise, clear, and may only extend to speech that is 'unambiguously related to the campaign of a particular federal candidate.'" 751 F.3d at 811 (quoting *Buckley*, 424 U.S. at 80). The Fourth Circuit used *Buckley*'s unambiguously campaign related standard in finding North Carolina's "political committee" definition overbroad and vague. *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 290 (4th Cir. 2008). And, in the words of the Tenth Circuit, "[i]n *Buckley*, the Court held that the reporting and disclosure requirements...survived 'exacting scrutiny' so long as they were construed to reach only that speech which is

---

[5] Of course, the Institute *is* "providing the electorate with information"—its proposed ad contains precisely the disclaimer discussed here by the Court and mandated by BCRA, and clearly identifies the Institute as the speaker. This case asks whether the *addition* of a filed report providing donor information provides the electorate with additional information sufficiently valuable to justify the imposition on the Institute's rights.

'unambiguously campaigned related.'" *N.M. Youth Organized v. Herrera*, 611 F.3d 669, 676 (10th Cir. 2010) (citing 424 U.S. at 79-81).[6]

Other district courts have applied the "unambiguously campaign related" standard in various contexts. In examining the federal disclosure regime, the Eastern District of Louisiana upheld federal campaign fund coordination regulation by noting that "it is the act of coordination that...arguably make a communication 'unambiguously campaign related.'" *Cao v. FEC*, 688 F. Supp. 2d 498, 541 (E.D. La. 2010). Just two years before *Cao*, the District of Utah noted *Buckley*'s standard in examining a state disclosure regime: "Supreme Court precedent makes clear that campaign finance laws may constitutionally regulate only those activities that are unambiguously campaign related." *Nat'l Right to Work Legal Def. and Ed. Found. v. Herbert*, 581 F. Supp. 2d 1132, 1144 (D. Utah 2008) (citing *Buckley*, 424 U.S. at 80).

* * *

Exacting scrutiny is "not a loose form of judicial review." *Barland*, 751 F.3d at 840. Rather, as a "strict test," *Buckley*, 424 U.S. at 66, it demands careful review of both the asserted governmental interest *and* whether the law is tailored to that interest, because "[i]n the First Amendment context, fit matters." *McCutcheon*,134 S. Ct. at 1456. As just discussed, disclosure's intrusions on issue speech and donors' associational privacy can only be justified by the informational interest—by providing information that informs the public about those supporting or opposing candidates. As explained below, BCRA as it applies to the Institute's genuine issue speech is not tailored because it lacks the necessary "substantial relation between the disclosure

---

[6] *But see Indep. Inst. v. Williams*, 812 F.3d 787, 796 (10th Cir. 2016) (holding that mentioning a candidate near in time to an election is "deemed sufficiently campaign-related" in as-applied challenge to a state electioneering communication provision, which mandated earmarked donor disclosure).

requirement and a sufficiently important governmental interest." *Citizens United*, 558 U.S. at 366-67 (internal citation and quotation marks omitted).

### III.   BCRA's electioneering communication reporting and disclosure regime is insufficiently tailored as applied to the genuine issue speech of a § 501(c)(3) organization.

The Supreme Court has upheld laws forcing disclosure related to traditional electioneering activities by the types of groups that do electioneering, but the Supreme Court has never addressed disclosure as applied to a group like the Independence Institute, one that is banned from such activity—indeed, one that can engage in only limited legislative or issue advocacy—because of its § 501(c)(3) status. As the D.C. Circuit recognized after examining the Institute's claims, "*Citizens United . . .* did not address whether a speaker's tax status or the nature of the nonprofit organization affects the constitutional analysis of BCRA's disclosure requirement." *Indep. Inst.*, 816 F.3d at 116-17; *see also id.* at 117 (noting that the "FEC cite[d] no precedent from the Supreme Court (or any other court)" addressing the constitutionality of disclosure laws to issue speech by § 501(c)(3) organizations, much less upholding such laws).

Section 501(c)(3) organizations are special: they have unique purposes, they are subject to unique restrictions, and they have been given unique protections. Thus, the Institute presents a new as-applied challenge to BCRA's electioneering communication regime, because no court has addressed the law's applicability to the circumstances surrounding § 501(c)(3) status. More importantly, because of these unique circumstances, the government lacks a sufficiently important interest to justify BCRA's burdens and the threat it poses to the privacy of § 501(c)(3) organizations' donors.

a.  **Congress and the Courts treat § 501(c)(3) organizations differently than § 501(c)(4) organizations.**

Congress created § 501(c)(3) organizations to foster the public good, as "[c]orporations . . . organized and operated exclusively for religious, charitable, scientific, . . . literary, or educational purposes." 26 U.S.C. § 501(c)(3). And, in recognition of this, the Supreme Court, Congress, and administrative agencies have long treated § 501(c)(3) organizations differently, even from other nonprofits.

Some of these differences were starkly recognized by the Supreme Court in *Regan v. Taxation with Representation*, 461 U.S. 540 (1983). Examining the statutory scheme governing § 501(c)(3) and § 501(c)(4) organizations, the Court noted "two principal differences." *Id*. at 543. First, donations to § 501(c)(3) organizations are tax-deductible while donations to § 501(c)(4) organizations are not: "Taxpayers who contribute to § 501(c)(3) organizations, are permitted by [26 U.S.C.] § 170(c)(2) to deduct the amount of their contributions on their federal income tax returns, while contributions to § 501(c)(4) organizations are not deductible." *Id*. This distinction contributes to the other "principal difference" between these types of organizations: § 501(c)(4) organizations may engage in unlimited lobbying, while § 501(c)(3) organizations may conduct only very limited lobbying. *Id*.; *see also* 26 C.F.R. § 1.501(c)(3)-1(a)(3)(i).[7] Thus, the Court examined how the different subsections of 26 U.S.C. § 501(c) work together to form a holistic system for regulating activity. *See id*. at 544; *id*. at 553 (Blackmun, J. concurring).

_____

[7] The § 501(c)(4) organization is conceptualized as a group advocating for certain public policies as a means to promote "social welfare." INTERNAL REVENUE SERVICE, Social Welfare Organizations, http://www.irs.gov/Charities-&-Non-Profits/Other-Non-Profits/Social-Welfare-Organizations (last accessed June 16, 2016) ("Seeking legislation germane to the organization's programs is a permissible means of attaining social welfare purposes. Thus, a section 501(c)(4) social welfare organization may further its exempt purposes through lobbying as its primary activity without jeopardizing its exempt status.").

But the differences recognized by the Supreme Court are accentuated by a number of others. In addition to the restrictions on lobbying, § 501(c)(3) organizations like the Institute are *prohibited* from engaging in *any* electioneering activity. That is, they may "not participate . . . or intervene in . . . any political campaign," even by "distributing . . . statements." 26 U.S.C. § 501(c)(3); *see also* 26 C.F.R. § 1.501(c)(3)-1(a)(3)(ii). These differences in the permitted activities between § 501(c)(3) organizations and 501(c)(4) organizations are great enough that an "action organization" can be denied § 501(c)(3) status but still "qualify as a social welfare organization under section 501(c)(4)." 26 C.F.R. § 1.501(c)(3)-1(c)(3)(v).[8]

Furthermore, consistent with these differences in permitted activity, donors to § 501(c)(3) organizations are generally offered greater protection than donors to § 501(c)(4) groups. *See*, *e.g.*, 26 U.S.C. § 6104(c)(3) (allowing the disclosure by the IRS to state officials of § 501(c)(4) returns—which includes donor information—but not of § 501(c)(3) returns). Indeed, the tax code specifically protects § 501(c)(3) organizations from the requirement that organizations maintain copies of donor lists for public review. 26 U.S.C. § 6104(d)(3)(A) (stating that the public inspection "shall not require the disclosure of the name or address of any contributor to the organization").

The Internal Revenue Service ("IRS") has also recognized that "[a]n organization may be educational even though it advocates a particular position or viewpoint," 26 C.F.R. § 1.501(c)(3)-1(d)(3)(i)(b), and the IRS's tax regulations accordingly make important distinctions between

---

[8] 26 U.S.C. § 501(h) creates an optional safe harbor and definition of substantial lobbying activity, but it is available only to §501(c)(3) organizations (not §501(c)(4) or other advocacy nonprofits, which can engage in as much lobbying as they wish). The Independence Institute elects treatment under 26 U.S.C. § 501(h). V. Compl. at 6 ¶ 28 (ECF 1), Statement of Undisputed Facts at 1, ¶ 2.

policy advocacy—which § 501(c)(3) organizations may do to a limited extent—and candidate advocacy, which § 501(c)(4) organizations may do in great measure.[9]

The IRS regulations specifically allow nonprofit organizations to include "influencing legislation" among the purposes stated in their articles of organization and "to make lobbying or grass roots expenditures that do not normally exceed" certain amounts. 26 C.F.R. § 1.501(c)(3)-1(b)(3).[10] IRS regulations require some indicia of support or opposition to a candidate to disqualify a § 501(c)(3)'s activity as non-exempt.[11] In particular, the IRS's operational test requires that an organization "participat[e] or intervene[] directly or indirectly in a political campaign *on behalf of or in opposition to a candidate*." 26 C.F.R. § 1.501(c)(3)-1(c)(3)(iii) (emphasis added).

Furthermore, the treatment by the IRS and the FEC of § 501(c)(3) organizations should be consistent: Congress specifically ordered the FEC and the IRS to "consult and work together to promulgate rules, regulations, and forms which are mutually consistent." 52 U.S.C. § 30111(f). Congress also made sure that BCRA did not change how organizations, including § 501(c)(3)

---

[9] A § 501(c)(4) organization may spend money directly seeking to elect candidates, provided that doing so does not become its primary purpose. *Compare* 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i) (the definition of social welfare organizations are those that are "primarily engaged in promoting in some way the common good and general welfare of the people of the community") *with* 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii) ("The promotion of social welfare does not include direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office").

[10] An organization's articles of organization can include "the trust instrument, the corporate charter, the articles of association, or any other written instrument by which an organization is created." 26 C.F.R. § 1.501 (c)(3)-1(b)(2).

[11] *See* IRS Rev. Rul. 2007-41, 2007-25 I.R.B. 1421 ("Whether an organization is participating or intervening, directly or indirectly, in any political campaign on behalf of or in opposition to any candidate for public office depends upon all of the facts and circumstances of each case."). The IRS uses seven factors to examine a § 501(c)(3) organization's communication. *Id*. at 1424. Even when an ad is close-in-time to an election, the IRS may still find it to not be political intervention. *See, e.g., id.* (Situation 14, featuring ad that "ends 'Call or write Senator C to tell him to vote for S. 24.'")

organizations, would be treated by the tax code for engaging in political or other activities, stating

that "[n]othing in this subsection may be construed to establish, modify, or otherwise affect the

definition of political activities or electioneering activities . . . for purposes of the Internal Revenue

Code." 52 U.S.C. § 30104(f)(7). That is, in passing BCRA, Congress did not intend to modify

what nonprofit organizations were permitted to do under the Internal Revenue Code, and the scope

of § 501(c)(3) activity—including the ability to occasionally run ads such as the Institute's—was

left intact. What is left to decide here is whether the Institute must trade one constitutional right,

speaking on issues, for another, donor privacy.[12]

### b. Due to the difference in tax status, the work of Citizens United differs significantly from the Independence Institute's proposed ad.

As stated above, the D.C. Circuit recognized what the Institute has argued all along:

"*Citizens United* . . . did not address whether a speaker's tax status or the nature of the nonprofit

organization affects the constitutional analysis of BCRA's disclosure requirement." *Indep. Inst.*,

816 F.3d at 116; *cf.* V. Compl. at 20 ¶¶ 91-92 (ECF 1). Nor was the D.C. Circuit aware of any

other case addressing the issue. *Indep. Inst.*, 816 F.3d at 117.

---

[12] And, consistent with the Congressional mandate to treat 501(c)(3) organizations consistently under BCRA and the tax code, the FEC initially recognized the difference between 501(c)(3) and other types of speakers in its regulations implementing BCRA by categorically exempting § 501(c)(3) activity. *See* FEC, Electioneering Communications Explanation and Justification, 67 Fed. Reg. 65190, 65211 (Oct. 23, 2002) (providing under final rule for 11 C.F.R. § 100.29(c)(6) that "[e]*lectioneering communication* does not include any communication that . . . [i]s paid for by any organization operating under section 501(c)(3) of the Internal Revenue Code") (emphasis in original). In exempting 501(c)(3) activity, the commission also noted fears that BCRA would effectively prohibit charities from running "public service announcements[,] . . . [d]ocumentaries and other educational programming featuring individuals who are candidates." *Id.* at 65199 (internal quotation marks omitted). This Court ultimately held that the FEC had failed to address several considerations in its rulemaking and remanded for further action by the Commission on the rule. *Shays v. FEC*, 337 F. Supp. 2d 28, 127-28, 130 (D.D.C. 2004), *aff'd by* 414 F.3d 76, 96 (D.C. Cir. 2005). Because the Commission failed to take any such action, the Institute is left without an administrative rule protecting its donors, even though it simply wishes to ask Coloradoans to urge their senators to support a bill.

In *Citizens United*, the Supreme Court examined a politically active § 501(c)(4) organization seeking to run pejorative commercial advertisements for a film that opposed Hillary Clinton's candidacy for President. Here, the FEC is painting a § 501(c)(3) educational organization with the same brush for seeking to air an advertisement that has nothing to do with any candidacy or any election.

While Citizens United, due to its tax status, could engage in speech that functioned as advocacy against Senator Clinton, the Independence Institute is barred, by federal law, from carrying out any candidate-centered electioneering. *Compare* 26 U.S.C. § 501(c)(3), *with* 26 U.S.C. § 501(c)(4). *Citizens United* concerned the speech of a § 501(c)(4) organization, which the Court noted had been "disclosing its donors for years." 558 U.S. at 370.[13] By contrast, the Independence Institute is organized under § 501(c)(3) and, like all such charities, has the right to— and does—keep its donors private.

Moreover, consistent with their differences in tax status, what the Institute does is vastly different from what Citizens United does. Citizens United actively uses its ability to engage in political advocacy, regularly creating films and advertisements about the Democratic Party's *candidates*. *Hillary*: *The Movie* and its ads coincided with Hillary Clinton's expected candidacy in 2008. "Four days after Senator Barack Obama won the Iowa presidential caucuses, [Citizens United] announced its intent to produce and broadcast a 'documentary' film about Senator Obama, as well as television advertising for that film." *Citizens United v. FEC*, No. 07-2240, FEC Mem. of L. in Supp. of Mot. for Summ. J. at 5 (D.D.C. June 6, 2008) (ECF 55).[14] And just this last

---

[13] The *Citizens United* Supreme Court decision does not mention the section of the tax code Citizens United was organized under, simply describing the group as "a nonprofit corporation." *Id.* at 319. The district court opinion described the filmmakers' nonprofit status as a § 501(c)(4). *Citizens United v. FEC*, 530 F. Supp. 2d 274, 275 (D.D.C. 2008) (three judge-court).

[14] *Available at* http://fec.gov/law/litigation/citizens_united_fec_motion_sj.pdf.

election cycle, Citizens United created *Rocky Mountain Heist*, a film that "unambiguously refer[red] to elected Colorado officials running for office [and] include[d] footage . . . where participants *advocate[d] the election or defeat of Colorado candidates*." *Citizens United v. Gessler*, 773 F.3d 200, 202 (10th Cir. 2014) (emphasis added).

By contrast, since it was established on May 31, 1985, V. Compl. ¶ 18, Statement of Undisputed Facts at 1, ¶ 1, the Institute has been a § 501(c)(3) educational organization. As such, it may "present[] public discussion groups, forums, panels, lectures, or other similar programs." 26 C.F.R. § 1.501(c)(3)-1(d)(3)(ii). Moreover, as part of its educational mission, the Institute may "advocate[] a particular position or viewpoint so long as it presents a sufficiently full and fair exposition of the pertinent facts." 26 C.F.R. § 1.501(c)(3)-1(d)(3)(i)(b). Furthermore, it may "advocate[] . . . the adoption or rejection of legislation," as long as such advocacy is "an insubstantial part of its activities." 26 C.F.R. § 1.501(c)(3)-1(c)(3)(ii)(b).[15] But it may not "intervene[]…in a political campaign on behalf of or in opposition to a candidate." 26 C.F.R. 1.501(c)(3)-1(c)(3)(iii). Indeed, if it the Institute were to engage in any such campaign advocacy, or in anything beyond the insubstantial lobbying permitted under § 501(h), it would lose its § 501(c)(3) status and be prohibited from becoming even a § 501(c)(4) organization. *See* 26 U.S.C. § 504(a).

---

[15] The IRS tests whether such advocacy is an insubstantial part of an organization's activities using "the expenditure test election of section 501(h)." 26 C.F.R. 1.501(c)(3)-1(c)(3)(ii)(b). Under § 501(h), overall, advocacy is capped with a formula based on 20% of the organization's expenditures. 26 U.S.C. § 501(h)(2)(B); *cf.* 26 U.S.C. § 4911(c)(2) (setting thresholds). For the Institute's proposed ad, spending is capped further: it can be only 25% of overall advocacy. 26 U.S.C. § 501(h)(2)(D); *cf* 26 U.S.C. § 4911(c)(4). An organization meets the requirements for a § 501(c)(3) organization as long as "it is not denied exemption from taxation under section 501(a) by reason of section 501(h)." 26 C.F.R. 1.501(c)(3)-1(c)(3)(ii)(b). The Institute elects treatment under § 501(h). V. Compl. ¶ 28, Statement of Undisputed Facts at 1, ¶ 2.

Moreover, the ad at issue here is consistent with the Institute's educational mission and permitted activity. It simply explains the problems with current federal sentencing laws, notes that there was a bill before Congress to fix those problems, and asks listeners to call their senators to ask them to support the bill. V. Compl. ¶ 35, Statement of Undisputed Facts at 1-2, ¶ 5. The ad says nothing about the Senators' positions on the bill, or about their positions on anything. It takes no position—even by hint or implication—on the "character, qualifications, or fitness for office" of either Senator Udall or Senator Bennet. *WRTL II*, 551 U.S. at 470 (Roberts, C.J., controlling opinion). It does not even mention an election, candidacy, or political party. The ad is thus "plainly not the functional equivalent of express advocacy" that only a § 501(c)(4) organization like Citizens United may engage in, nor is it "unambiguously campaign related." *Id.*; *Buckley*, 424 U.S. at 81. Rather, the ad focuses solely on the merits of a legislative issue—encouraging the passage of the Justice Safety Valve Act—and even then must be confined within the limited lobbying activity allowed to § 501(c)(3) organizations under 26 U.S.C. § 501(h).

Nevertheless, the FEC maintains that it may constitutionally compel the Institute to register with the Commission and disclose its donors. But this cannot be the law: as the civil rights cases of the 1950s and 1960s discussed above amply demonstrate, donors have privacy rights, and the harm to the privacy rights of donors to a nonpolitical, nonprofit organization through disclosure can be particularly troublesome. Moreover, where, as here, a nonprofit is prohibited from any candidate advocacy and restricted to only limited lobbying, the government has a minimal or nonexistent interest in the donors' identity and contributions—such disclosure tells the public nothing about who is supporting or opposing candidates. Thus, the Institute's 26 U.S.C. § 501(c)(3) status, and its speech consistent with that status, demonstrates the excessive breadth of BCRA's disclosure regime as-applied, and is thus far from "immaterial."

Similarly, because § 501(c)(3) organizations are prohibited from electioneering, labeling their genuine issue speech as an "electioneering communication"—in addition to misleading the public in contravention of the informational interest—will invite legal risk and reputational harm. Those disagreeing with a § 501(c)(3), and especially laypersons for whom any metaphysical difference between an "electioneering communication" and "intervention in a campaign" will be incomprehensible, may file complaints with the IRS and regulators that will be expensive to defend, both in terms of attorney time and the potential harm to fundraising efforts.[16] And even allies will doubtless be confused by the nonsensical labeling the FEC attempts here. Moreover, the need to file reports, and prepare the internal procedures to do so accurately, is itself an independent harm that is especially dangerous for § 501(c)(3)s, which would be asked to file electioneering communications reports while simultaneously reporting to the IRS that, consistent with their status, they do not engage in electioneering—a process that is costly in its own right and could easily lead to confusion.[17]

---

[16] For example, this Court is hearing several challenges from Citizens for Responsibility and Ethics in Washington ("CREW") alleging the FEC failed to bring enforcement actions against instances of unreported "electioneering communications." *See*, *e.g.*, *CREW et al. v. FEC*, No. 15-2038, Compl. (D.D.C. Nov. 23, 2015) (ECF 1). The Independence Institute itself has been subject to such complaints, *Indep. Inst. v. Coffman*, 209 P.3d 1130, 1134 (Colo. Ct. App. 2008), but was vindicated before the administrative law judge that its activity did not qualify it as "an 'issue committee" under Colorado campaign finance law. *Id.*

[17] CREW recently filed—with the FBI, Department of Justice, and IRS simultaneously—complaints against ten organizations alleging violations of the campaign finance laws. One complaint seeks *felony* charges for an asserted failure to report "political activity" (as defined and alleged by CREW) on Schedule C of IRS Form 990. CREW, Complaints Against American Dream Initiative, Arizona Future Fund, Jobs and Progress Fund, Inc., Michigan Citizens for Fiscal Responsibility, Mid America Fund, Inc., and Rule of Law Project, at 4 (June 15, 2016), *available at* http://www.citizensforethics.org/page/-/PDFs/Omnibus%20DOJ%20complaint%206-15-16.pdf. The IRS complaints are gathered on CREW's website. CREW, Press: "CREW Files Criminal, IRS Complaints Against 10 Dark Money Groups." http://www.citizensforethics.org/press/entry/crew-files-criminal-irs-complaints-against-10-dark-money-groups.

The Institute accordingly notes that BCRA imposes unique burdens upon § 501(c)(3) organizations, including demanding donor disclosure, a special harm recognized by the courts and Congress. This affects the required constitutional analysis, and further distinguishes this case from *Citizens United,* which involved a § 501(c)(4) organization that already disclosed the donors responsible for its political messaging. A new tailoring analysis is accordingly required for this as-applied challenge, and under that analysis BCRA is unconstitutional.

IV.    **BCRA's electioneering communications definition and disclosure regulations unconstitutionally burden the rights of the Independence Institute and its supporters to freedom of speech and association.**

   a.  **The Supreme Court has consistently required that burdens on issue speech meet the tailoring requirements of exacting scrutiny, a trend that extends to** *Citizens United***.**

The Supreme Court has never, in any case actually dealing with genuine issue speech, upheld a choking regulation on such speech. *See*, *e.g.*, *WRTL II*, 551 U.S. at 476 (Roberts, C.J., controlling opinion). The government's interests have been too slight or the burdens of the law on fundamental rights too great to pass constitutional scrutiny. As previously noted, the First Amendment protects the right of Americans "to pursue their lawful private interests privately and to associate freely with others in so doing." *NAACP v. Ala.*, 357 U.S. at 466. The Supreme Court has long held that "'[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *Id.* at 460. Indeed, "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association," *id.* at 462, and compelled disclosure thus imposes too "significant [an] encroachment upon personal liberty," *Bates*, 361 U.S. at 524. *See also Buckley*, 424 U.S. at 66 (holding that "compelled disclosure has the potential for substantially infringing the exercise of First Amendment rights").

Accordingly, the Supreme Court has consistently required that the government demonstrate precisely why the associational veil ought to be pierced, and to narrowly confine compelled disclosure to an important governmental purpose. *See*, *e.g.*, *Bates*, 361 U.S. at 524 ("Decision in this case must finally turn, therefore, on whether the cities as instrumentalities of the State have demonstrated so cogent an interest in obtaining and making public the membership lists of these organizations as to justify the substantial abridgment of associational freedom which such disclosures will effect").

It is true that the Supreme Court has said "that disclosure is a less restrictive alternative to more comprehensive regulations of speech." *Citizens United*, 558 U.S. at 369. It is also true that the *Citizens United* court rejected the application of *WRTL*'s express advocacy limitation as applied to Citizen United's advocacy. *See id* at 368-69. But, as the following shows, there is a basic principle harmonizing the Supreme Court's issue speech jurisprudence: "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Buckley*, 424 U.S. at 41 n.48 (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). And to effectuate that principle while recognizing the government's interests, long-standing and continuing precedent requires that any government regulation infringing on that fundamental right must be substantially related to "a sufficiently important governmental interest." *See Citizens United*, 588 U.S. at 366-67 (internal quotation marks omitted). Thus, it does not matter that another type of burden is greater than the one at issue or that the burden at issue was sufficiently tailored when measured against another type of speech. Those may be relevant considerations, but what the government must prove is that the burden it is imposing on a particular type of speech is actually sustained by a related, and important, interest. Consideration of *Buckley*,

*McConnell*, *WRTL II*, and *Citizens United* shows that BCRA, as applied to the Institute's issue speech, does not meet exacting scrutiny.[18]

When dealing with important First Amendment freedoms for which it is hard to distinguish the boundary between protected speech and permissibly regulated speech, it is the government's interest that must bow to the First Amendment. *See WRTL II*, 551 U.S. at 457 (holding that "the First Amendment requires us to err on the side of protecting political speech rather than suppressing it"). For example, the *Buckley* court noted that "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application." *Buckley*, 424 U.S. at 42; *see also Citizens United*, 558 U.S. at 358; *WRTL II*, 551 U.S. at 456. Accordingly, weighing both issue speech and advocacy against the public's interest in knowing who supports or opposes a candidate, the Court held that the government could not regulate a very large subset of *advocacy*. That is, it restricted the law at issue to controlling only "communications that include explicit words of advocacy of election or defeat of a candidate." *Buckley*, 424 U.S. at 43. Any other rule then apparent to the Court would have stifled speech that had no relation to informing the public about a candidate's constituency. In other words, under any other rule, the law then before the Court would have failed exacting scrutiny.

---

[18] *Buckley v. Valeo*, 519 F.2d 821 (D.C. Cir. 1975) (en banc), remains one of the most directly relevant Court of Appeals cases. The statute at issue there, 2 U.S.C. § 437a (the only portion of the *Buckley* challenge not to make its way to the Supreme Court, *Buckley*, 424 U.S. at 10 n.7), similarly triggered disclosure for publications "or broadcasts [of] any material referring to a candidate," which included "setting forth the candidate's position on any public issue." 519 F.2d at 869-70. In fact, FECA § 437a explicitly sought the same scope of government power that the Commission claims here: namely, the right to regulate any speech, regardless of whether that speech advocates an election result or is related to a political campaign, or if it instead merely mentions a candidate in relation to "any public issue." *Id*. In response, the D.C. Circuit determined that imposing disclosure requirements upon communicators for "tak[ing] public stands on public issues" was impermissible under the First Amendment because, when compared to campaign-related speech, "the nexus" between issue speech and any cognizable governmental interest "may be far more tenuous." *Buckley*, 519 F.2d at 872

Courts interpreted *Buckley* as holding that a law was not tailored unless it included certain magic words of express advocacy, and eventually "[c]orporations and unions [were spending] hundreds of millions of dollars" to pay for ads that were clearly express advocacy but could not be regulated as such because they "eschewed the use of [those] magic words." *McConnell*, 540 U.S. at 126-27. To advocate for a candidate's defeat, for example, an ad would "condemn[] Jane Doe's record on a particular issue before exhorting viewers to 'call Jane Doe and tell her what you think.'" *Id.* at 127.

Accordingly, Congress passed BCRA to close these loopholes and effectively regulate what had always been obvious attempts to elect or defeat particular candidates—that is, depending on the specific communication, either express advocacy or something very like it. And, based on what the Supreme Court called a "voluminous record" showing such abuse of the magic words test, *McConnell*, 540 U.S. at 132, the Supreme Court upheld BCRA against a facial challenge, to the extent that the law was tailored to speech that "was the 'functional equivalent' of express campaign speech." *WRTL II*, 551 U.S. at 456 (quoting *McConnell*, 540 U.S. at 204-205, 206). The *McConnell* court, however, noted that different interests apply to the regulation of campaign speech and "the regulation of genuine issue ads." 540 U.S. at 206 n.88; *see also WRTL II*, 551 U.S. at 456. Thus, based on that principle, a court must perform a different scrutiny analysis when dealing with issue speech than when dealing with campaign speech, i.e., the law at issue must be substantially related to the different interests implicated by campaign and issue speech.

In *WRTL II*, the plaintiffs mounted an as-applied challenge to the same provision of BCRA, arguing that it was unconstitutional as applied to speech that was not the functional equivalent of express advocacy. *WRTL II*, 551 U.S. at 456. The FEC, on the other hand, "perversely" argued that it should be able to regulate even genuine issue ads because such ads are "more likely . . . to

be the functional equivalent of express advocacy." 551 U.S. at 471 (Roberts, C.J., controlling opinion). The Supreme Court rejected the FEC's contention, holding that "[i]t would effectively eliminate *First Amendment* protection for genuine issue ads" in as-applied challenges. *Id*. (emphasis in original).[19] The Supreme Court further "conclude[d] that the interests held to justify restricting corporate campaign speech or its functional equivalent do not justify restricting issue advocacy," *id*. at 457, i.e., that the law was not tailored to the government's interests.[20] Notably, the Court did not state that there is a bright-line distinction between issue speech and electoral advocacy prohibiting any type of regulation of issue speech or quasi-issue speech. It did, however—in describing the scope of its "functional equivalent of express advocacy" test—explain that a genuine issue ad would "focus on a legislative issue, take a position on the issue, exhort the public to adopt that position, and urge the public to contact public officials with respect to the matter." *Id*. at 469-70. And it held that different governmental interests apply to express advocacy and genuine issue speech. Applying those different interests to the BCRA provision at issue there, the provision failed constitutional scrutiny. *Id*. at 457.

Some courts have sensed a discordant theme in *Citizens United*, the Supreme Court's next case to deal with campaign finance issues. But that case did not deal with the genuine issue ads identified by the *WRTL II* Court. Rather, it principally addressed *Hillary: The Movie*, although advertisements promoting the movie were carried along in the decision's slipstream. As the Court stated, "The movie, in essence, [was] a feature-length negative advertisement that urges viewers

---

[19] The Supreme Court also rejected the District Court's conclusion "that the reasoning of the *McConnell* Court leaves no room for" an as-applied challenge. *WRTL II*, 551 U.S. at 460 (internal quotation marks omitted).

[20] The Supreme Court then applied this broad holding on restrictions of corporate speech to the narrower issue of corporate speech bans and found the latter unconstitutional. *WRTL II*, 551 U.S. at 457.

to vote against Senator Clinton for President." 558 U.S. at 325. The Court noted that "[t]he movie concentrate[d] on alleged wrongdoing during the Clinton administration, Senator Clinton's qualifications and fitness for office, and policies . . . she would pursue." *Id*. And it called her "Machiavellian" and played on Americans' dislike of "dynasties." *Id*. Accordingly, the Supreme Court held that "there is no reasonable interpretation of *Hillary* other than as an appeal to vote against Senator Clinton," such that it qualified under the *McConnell* and *WRTL* standard "as the functional equivalent of express advocacy." *Citizens United*, 558 U.S. at 326.

Included in the Court's decision were "two 10-second ads and one 30-second ad for *Hillary*." *Id*. at 320. According to the Court, "[e]ach ad include[d] a short (and, in [the Court's] view, pejorative) statement about Senator Clinton, followed by the name of the movie." *Id*.  In the first ad, Hillary Clinton's face was placed on the screen with the narration, "If you thought you knew everything about Hillary Clinton . . . wait 'til you see the movie." *Citizens United v. FEC*, 530 F. Supp. 2d 274, 276 n.2 (D.D.C. 2008). In the second ad, Hillary Clinton's face was placed on the screen with the narration, "'First, a kind word about Hillary Clinton . . . She looks good in a pant suit.' 'Now, a movie about the everything else.'" *Id*. at n.3. The third ad stated, "'Who is Hillary Clinton?' . . . '[A]t least with Bill Clinton he was just a good time Charlie. Hillary's got an agenda . . .' . . . 'Hillary is the closest thing we have  in America to a European socialist . . .' 'If you thought you knew everything about Hillary Clinton . . . wait 'til you see the movie.'" *Id*. at n.4.

In resolving the as-applied challenge before it, the Supreme Court upheld BCRA's disclosure requirements as against these "pejorative" equivalents of express advocacy. *Citizens United*, 558 U.S. at 368-69. The Supreme Court rejected any protection from *WRTL II*'s express advocacy limitation, as applied to Citizens United's campaign advocacy, although it did so with

broader language, stating that it "reject[ed] Citizens United's contention that the disclosure requirements must be limited to speech that is the functional equivalent of express advocacy." *Id.* at 369.

That holding is unsurprising, however. It does not mean that issue speech suddenly lost the importance and constitutional protection it has held for 60 years. The statement there simply manifests a facet of the Supreme Court's issue speech jurisprudence since *Buckley*: there are few bright line rules regarding issue speech and campaign advocacy because the two are hard to distinguish. Accordingly, a Court must look at what the speech at issue communicates about candidates, the government's interest, and the fit. A bright line distinction made no sense as applied to the pejorative advocacy at issue in *Citizens United*.

That this is what the *Citizens United* court meant is indicated by its subsequent discussion of the informational interest. The Court held that the informational interest applied to Citizens United's "pejorative" ads because "the public has an interest in knowing who is speaking about a candidate shortly before an election." *Id.* at 368-69. Such "disclosure helps voters to define more of the candidates' constituencies," *Buckley*, 424 U.S. at 81, such that voters can "place each candidate in the political spectrum more precisely," *id.* at 67. This interest applied to the pejorative ads at issue in *Citizens United* because the ads were attempting to sway public opinion about Hillary Clinton's fitness to be president and knowing who supported the ads would help voters understand Hillary Clinton's place on the political spectrum.

A broader understanding of *Citizens United*'s statement about issue speech and express advocacy would not fulfill this interest, however: if speech contains no hint of advocacy about a particular candidacy, then understanding who is speaking will not inform voters about a candidate's constituency. Disclosure under a broader understanding of the holding would only

confuse voters and make their evaluations of candidates' positions on the political spectrum less precise, because they would be attributing support or opposition to candidates from people who were not supporting or opposing candidates in their speech.[21]

Accordingly, *Buckley*, *McConnell*, *WRTL II*, and *Citizens United* together form a harmonious whole: While courts do not—because of the difficulty in distinguishing issue speech from express advocacy—automatically exclude speech from any regulation merely because it is issue-oriented, they must examine the different interests that apply to issue speech and candidate advocacy and analyze how those different interests apply to the speech and state-imposed burdens presented in particular, as-applied cases. *See WRTL II*, 449 U.S. at 476 (analyzing tailoring); *id*. at 478 (interest supporting each application).

>   **b.  *WRTL II* and *Citizens United* show that the government has only a limited interest.**

While neither *WRTL II* nor *Citizens United* are directly on point here, as *WRTL II* dealt with an as-applied challenge to BCRA's ban on issue advocacy by corporations and *Citizens United* dealt with a challenge to BCRA's disclosure burdens in the context of pejorative speech functioning as express advocacy, they are nonetheless informative in how the Supreme Court weighed the government's interest in the exacting scrutiny analysis.

---

[21] Furthermore, a broader understanding of *Citizens United*'s statement about express advocacy is belied by the Court's discussion of the press. The Court stated, "There is no precedent supporting laws that attempt to distinguish between corporations which are deemed to be exempt as media corporations and those which are not. We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers." *Citizens United*, 558 U.S. at 352 (internal quotation marks omitted). But, if the public had an interest in knowing about anyone speaking about a candidate for any purpose whatsoever, including genuine issue speech and news stories, either the press should be subject to disclosure requirements any time it mentions a candidate, or BCRA has created an unconstitutional distinction between the media and other parties. *See Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) ("The liberty of the press is not confined to newspapers and periodicals. . . . The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.").

The radio ad at issue here explains problems with the current federal sentencing laws, notes a bill presently before Congress to fix the problems, and asks listeners to call their senators—Mark Udall and Michael Bennet—and tell them to support the bill. V. Compl. at 7-8 ¶ 35 (ECF No. 1); *cf. WRTL II*, 551 U.S. at 470. The ad says nothing about the Senators' positions on the bill, or even about their positions on criminal matters in general, that would cause the listeners to judge the senators, either positively or negatively. *Cf. WRTL II*, 551 U.S. at 470. But because the ad identifies Colorado's senators, in a year when one is seeking reelection, the ad triggers BCRA's regulation of speech. In short, BCRA treats the Institute's ad as if it were campaign related, like the movie and ads in *Citizens United*.

The ads and movie at issue in *Citizens United* were pejorative and the functional equivalent of express advocacy. 558 U.S. at 320 ("Each ad includes a short (and, in our view, pejorative) statement *about Senator Clinton . . .* "); *id*. at 368  ("The ads . . . contained pejorative references *to [Clinton's] candidacy*") (emphasis added); *id*. at 325 ("*Hillary* is equivalent to express advocacy"). They did not discuss any important public issues pending before Congress, where Hillary Clinton then sat as Senator, seeking help to get her to take a position on an issue. They were not exclusively directed to the citizens Hillary Clinton then represented as Senator, whose views and interests she would want to know and represent before the Senate. The ads did not even ask those she represented to call her regarding some issue. *Citizens United*, 530 F.Supp. 2d at 276 nn. 2-4. Rather, the movie and ads were meant for a nationwide audience, one that was only relevant in the context of a future campaign for president. The ads were intended to elicit a judgment about Sen. Clinton's fitness to be president as someone (in Citizens United's view) whose background was filled with hidden skeletons and scandal, someone with no positive attributes other than her appearance in a suit, and someone who was a socialist with an agenda

adverse to the public interest. *Id.* These communications were the functional equivalent of express advocacy, and certainly related to Senator Clinton's *candidacy*, and thus utterly unlike the ad at issue here.[22]

Independence Institute's ad, by contrast, is more similar to those in *WRTL II*, for which the government had at most a minimal interest. Each ad in *WRTL II* began with someone's life being interrupted in some way—a wedding ceremony where the bride's father began talking about drywall, a loan application interview where the loan officer began talking about childhood fishing trips, and a judicial nominee waiting at home with nothing to do. *WRTL II*, 551 U.S. at 458-59, 459 n.2, 459 n.3. The ads then accused the members of the Senate of causing gridlock and a state of emergency in the courts because of the filibuster. *Id.* The ads finally asked listeners to contact Senators Feingold and Kohl to oppose the filibuster. *Id.*

Thus, like the ad at issue here, the content of the ads was "consistent with that of a genuine issue ad" because they "focus[ed] on a legislative issue, [took] a position on the issue, exhort[ed]

---

[22] To the extent they did not function as express advocacy, the *Citizen United* ads were commercial speech to advertise for the movie *Hillary*. *Citizens United*, 530 F. Supp. 2d at 280 (discussing commercial nature of the ads urging people to "buy the DVD of *The Movie*"). The Supreme Court has long held that commercial speech can be more heavily regulated than issue speech. *See, e.g.*, *Williams*, 553 U.S. at 298 (noting that the "First Amendment status of commercial speech" is "less privileged" than other forms of speech); *Cent. Hudson Gas & Elec.*, 447 U.S. at 562-563 ("The Constitution therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."). In fact, the government may *compel* speech in the commercial context in a way it cannot for discussions of public policy. *Am. Meat Inst. v. United States Dep't of Agric.*, 760 F.3d 18, 31 (D.C. Cir. 2014) ("The Government has long required commercial disclosures to prevent consumer deception or to ensure consumer health or safety."); *see also R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1211 (D.C. Cir. 2012), *overruled on other grounds, as recognized by Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 520 (D.C. Cir. 2015) (noting that there was no dispute about Congress's authority to require health warnings on cigarette packages).

Thus, to the extent that the *Citizens United* Court relied upon the commercial nature of the *Hillary* advertisements—as opposed to finding that the ads were advocacy against a candidacy—this supports the Institute's point that *Citizens United* does not control the tailoring analysis for this case.

the public to adopt that position, and urge[d] the public to contact public officials with respect to the matter." *Id*. at 470 (Roberts, C.J., controlling opinion). And, again like the ad at issue here, the ads "lack[ed] indicia of express advocacy" because "they [did] not take a position on a candidate's character, qualifications, or fitness for office." *Id*.

Based on this record, the Supreme Court held that the ads—like those at issue here—were "plainly not the functional equivalent of express advocacy." *Id*. at 470. And, lacking any sufficient interest to justify the burdens on speech at issue there, the Supreme Court found the application of the regulation to the ads unconstitutional. *Id*. at 481.

In sum, the ads at issue here and in *Citizens United* are too dissimilar for the Supreme Court's reasoning and ruling there—as applied to pejorative expressive advocacy or its equivalent—to apply to the as-applied challenge here regarding genuine issue speech.[23] Rather, the speech here is even more "plainly not the functional equivalent of express advocacy" than the ads at issue in *WRTL II*, *id*. at 470—because the ad here casts no aspersions on Congress's performance whatsoever. Thus, as in *WRTL II*, this Court must go back to the basic principle that "government may regulate in the area only with narrow specificity," *Buckley*, 424 U.S. at 41 n.48, and force the government to demonstrate "that a [sufficiently important] interest supports *each application* of a statute restricting speech." *WRTL II*, 551 U.S. at 478 (Roberts, C.J., controlling opinion) (emphasis in original).

---

[23] Similarly, the Supreme Court reasoned in relation to a corporate ban on spending in *WRTL II*, "[t]hat a [sufficiently important] interest justif[ying] restrictions on express advocacy tells us little about whether a [sufficiently important] interest justifies restrictions on issue advocacy." *WRTL II*, 551 U.S. at 478 (Roberts, C.J., controlling opinion); *Citizens United*, 558 U.S. at 366-67 (noting factors for exacting scrutiny).

The only interest at issue with disclosure regulations and issue speech like those at issue here, however, is the informational interest.[24] And the government has no informational interest in genuine issue speech. Rather, as discussed above, disclosure related to such speech tells voters nothing about who is supporting or opposing a candidate. It thus does nothing to help voters "place each candidate in the political spectrum more precisely." *Buckley*, 424 U.S. at 67. Disclosure of donors to an educational nonprofit that merely mentions a state's sitting U.S. senators has no connection, in this case, to that interest. Instead, disclosure would confuse voters by suggesting that donors are supporting or opposing candidates when in fact they are not.

As discussed above, BCRA imposes heavy burdens on organizations like the Institute: § 501(c)(3) entities engaging only in issue speech. BCRA violates the privacy rights of both the organizations and their donors, and it yokes even small organizations with substantial administrative burdens. Such burdens may be appropriate for other organizations engaging in other types of speech. But it chills the speech of a § 501(c)(3) that works hard to keep its donors private and that cannot, by statute, engage in any candidate-support or candidate-opposition activity, as seen in its silence about an important public issue in 2014.

Thus, "[b]ecause [Independence Institute's] ad[ is] not express advocacy or its functional equivalent"—indeed it is genuine issue speech that is not even close to unambiguously campaign-related—and "because [the government] identif[ies] no interest sufficiently [important] to justify

---

[24] The anti-circumvention interest, *see Buckley*, 424 U.S. at 68, is irrelevant here because there are no contribution limits, and consequently no violations of those limits to detect through disclosure. The anti-corruption interest, *see id.* at 67, is also irrelevant because—as this is genuine issue speech done independently of any candidate—there are no quid pro quo deals to detect. *See WRTL II*, 551 U.S. at 478-79 (Roberts, C.J., controlling opinion) (noting that genuine issue ads are not equivalent to contributions).

burdening [Independence Institute's] speech," BCRA's disclosure requirements are unconstitutional as applied to Independence Institute's ad. *WRTL II*, 551 U.S. 481.

### V.     Ruling in favor of the Institute and its activity keeps BCRA intact while properly limiting its reach to unambiguously campaign-related speech.

Despite signing BCRA into law, the President noted in his signing statement that "[c]ertain provisions present constitutional concerns," and he expressed "reservations about the constitutionality of the broad ban on issue advertising, which restrains the speech of a wide variety of groups on issues of public import in the months closest to an election." George W. Bush, Statement on Signing the Bipartisan Campaign Reform Act (March 27, 2002).[25] The President observed that he "expect[ed] that the courts w[ould] resolve these legitimate legal questions as appropriate." *Id*. The courts did resolve certain of those legal questions by upholding, facially, the electioneering communications definition. *McConnell*, 540 U.S. at 199.

Here, an as-applied challenge is brought, but ruling for the Institute would not unravel BCRA. In the event that the expansive definition of "electioneering communications" was found to be overbroad in this context, Congress specifically provided for a backup definition of "electioneering communication"—a definition narrowing its reach to accord with the Constitution:

> If clause (i) is held to be constitutionally insufficient by final judicial decision to support the regulation provided herein, then the term "electioneering communication" means any broadcast, cable, or satellite communication which promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate) and which also is suggestive of no plausible meaning other than an exhortation to vote for or against a specific candidate.

52 U.S.C. § 30104(f)(3)(A)(ii). Under the backup definition, any communication in the electioneering communications window that Promotes, Attacks, Supports, or Opposes ("PASO")

---

[25] *Available at* http://www.presidency.ucsb.edu/ws/?pid=64503.

a candidate may be regulated. The PASO standard is narrower, and more constitutionally defensible, than regulating any speech that merely mentions a candidate within the electioneering communications window (the current law), but it still captures the "unambiguously campaign-related" speech in which the government has an appropriate informational interest.

And the PASO standard already enjoys the Supreme Court's approval. *McConnell*, 540 U.S. at 170, *id.* n.64. Likewise, a panel of the First Circuit used a similar promotes or opposes construction to narrow a Maine law that would otherwise have been overbroad. *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 66 (1st Cir. 2011). As the First Circuit noted, such a standard "succeeds both in 'provid[ing] explicit standards for those who apply' the provisions at issue here and in ensuring that persons of average intelligence will have reasonable notice of the provisions' coverage." *Id.* (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)) (alteration in *McKee*).

Thus a ruling in favor of the Independence Institute will not upset the ordinary enforcement of the campaign finance laws, but it will protect the Institute's genuine issue speech from the burdens of campaign finance disclosure and its donors from the loss of their privacy rights.

## VI. The Independence Institute's challenge is not moot because it intends to run substantively similar ads in the future.

This Court ordered the parties to "address whether their dispute is now moot" and if the Independence Institute "intends to make a qualifying 'electioneering communication' . . . for the upcoming election cycle." Scheduling Order at 2, *Indep. Inst. v. FEC*, No. 1:14-cv-1500-CKK-PAM-APM (D.D.C. May 17, 2016), ECF No. 35. This dispute, like almost all challenges to election laws, is not moot because it "fit[s] comfortably within the established exception to mootness for disputes capable of repetition, yet evading review." *WRTL II*, 551 U.S. at 462.

The test is twofold: "The exception applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Id.* (internal quotation marks omitted). The first prong of this test is easily met, because BCRA's electioneering communication window is too short for "complete judicial review of its claims in time for it to air its ads" *Id.* (internal quotation marks omitted); *cf. Holmes v. FEC*, 99 F. Supp. 3d 123, 138 (D.D.C. 2015) ("Election controversies like this one 'are paradigmatic examples of cases that cannot be fully litigated before the particular controversy expires.'" (quoting *Moore v. Hosemann*, 591 F.3d 741, 744 (5th Cir. 2009)).

As for the second prong, the D.C. Circuit considered that precise issue, in this very case, when the FEC asserted mootness in its Answer Brief on appeal.[26] The Institute promptly disagreed,[27] and it filed a motion to supplement the record on appeal with a Declaration of Jon Caldara, the Independence Institute's president, stating the Institute's intention in future years to run substantively similar advertisements to the one at issue here.[28] The declaration was accompanied by a press release dated November 3, 2014, stating the Institute's intent to run future ads should it win this challenge.[29]

---

[26] Ans. Br. at 46, *Indep. Inst. v. FEC*, No. 14-5249 (D.C. Cir. May 8, 2015), ECF No. 1551586.

[27] Reply Br. at 24-27, *Indep. Inst. v. FEC*, No. 14-5249 (D.C. Cir. May 22, 2015), ECF No. 1553771.

[28] Motion to Supplement Record at 7-8, *Indep. Inst. v. FEC*, No. 14-5249 (D.C. Cir. Sept. 24, 2015), ECF No. 1574833; Declaration of Jon Caldara, Ex. A, *id.*

[29] Attachment A, *id.*

Normally, this Court can take judicial notice of the existence and content of newspaper articles and other media. *See, e.g., Wash. Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) (citing Fed. R. Evid. 201(c)); *Council of the Dist. of Columbia v. Gray*, 42 F. Supp. 3d 134, 149 n.5 (D.D.C. 2014), *rev'd on other grounds*, No. 14-7067, 2015 U.S. App. LEXIS 8881 (D.C. Cir. May 27, 2015) (applying *Washington Post*). However, the Institute's press release—issued the day

After full briefing,[30] the Court of Appeals granted the motion and admitted the declaration and press release. Order, *Indep. Inst. v. FEC*, No. 14-5249 (D.C. Cir. Oct. 13, 2015), ECF No. 1577832 (per curiam). At oral argument before the D.C. Circuit, the Commission admitted that the Institute's challenge was not moot under the "capable of repetition, yet evading review" exception. Oral Argument at 24:53, *Indep. Inst. v. FEC*, No. 14-5249 (D.C. Cir. Oct. 22, 2015).[31] The Court of Appeals reached the merits of the appeal and ordered the convening of this Court. *Indep. Inst. v. FEC*, 816 F.3d 113, 117 (D.C. Cir. 2016). Neither the majority nor the dissenting judge believed the FEC's by-then-abandoned mootness issue merited mention. *See id.* at 114-19.

The Institute faces the same difficulties in speaking this year as it did in 2014,[32] and has stated its intent to run substantively similar ads in this and future years. Such declarations are enough to alleviate mootness. *Unity08 v. FEC*, 596 F.3d 861, 864 (D.C. Cir. 2010) (finding case was not moot where plaintiff filed "a sworn declaration unambiguously stating a conditional intent to resume activities in a future election cycle if the group wins its lawsuit against the [Federal Election] Commission"); *cf. Holmes*, 99 F. Supp. 3d. at 139 (collecting cases). Both the Declaration of Jon Caldara and the Press Release, which are now part of the record pursuant to an order of the Court of Appeals, are appended to this filing as Exhibit A. Order, *Indep. Inst. v. FEC*, No. 14-5249 (D.C. Cir. Oct. 13, 2015), ECF No. 1577832 (per curiam).

---

before Election Day 2014—was not picked up by a media outlet. It is therefore not readily accessible by this Court.

[30] In total, mootness was briefed five times before the D.C. Circuit.

[31] *Available at* https://www.cadc.uscourts.gov/recordings/recordings2016.nsf/638E93666D13933685257EE600 58FB78/$file/14-5249.mp3.

[32] When the Institute first brought the challenge in 2014, the proposed ad mentioned both Colorado Senators Udall and Bennett. At the time, Senator Udall was a candidate seeking reelection, which he ultimately lost. Now, *Senator Bennett* is up for reelection, and the Justice Safety Valve Act is still under consideration by Congress.

**Conclusion**

For the reasons above, Plaintiff Independence Institute respectfully asks that the Court grant summary judgment, holding that 52 U.S.C. § 30104(f) is overbroad under the First Amendment, as applied to the Independence Institute and its proposed advertisement (or substantively similar advertisements), and enjoining enforcement of 52 U.S.C. § 30104(f) against the Independence Institute for its proposed activity.

Respectfully submitted,

s/ Allen Dickerson
Allen Dickerson (D.C. Bar No. 1003781)
Tyler Martinez (D.C. Bar No. 1022937)

Center for Competitive Politics
124 S. West Street, Suite 201
Alexandria, Virginia 22314
Telephone: 703.894.6800
Facsimile: 703.894.6811
adickerson@campaignfreedom.org
tmartinez@campaignfreedom.org

*Counsel for Plaintiff*
*Independence Institute*

Dated: June 17, 2016