UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INDEPENDENCE INSTITUTE, ) | |
| ) | |
| Plaintiff, ) | Case No. 14-cv-1500 |
| ) | |
| v. ) | |
| ) | |
| FEDERAL ELECTION COMMISSION, ) | |
| ) | |
| Defendant. ) | |

Before: Millett, *Circuit Judge*; Kollar-Kotelly and Mehta, *District Judges*.

Opinion for the Court filed by *Circuit Judge* Millett.

MEMORANDUM OPINION

Millett, *Circuit Judge*:

Independence Institute, a Colorado-based non-profit organization, filed suit against the Federal Election Commission seeking a declaratory judgment that the Bipartisan Campaign Reform Act's disclosure provision, 52 U.S.C § 30104(f), is unconstitutional as applied to a radio advertisement that it desired to run during the time leading up to the 2014 and 2016 general elections. Both Independence Institute and the Federal Election Commission move for summary judgment.[1] For the reasons discussed below, we DENY Independence Institute's Motion for Summary Judgment and GRANT the Federal Election Commission's Motion for Summary Judgment.

---

[1] Indep. Inst. Mot. for Summ. J. and Mem. in Supp., ECF No. 36; FEC's Mot. for Summ. J., ECF No. 42.

## I

Congress passed the Bipartisan Campaign Reform Act of 2002 ("Act"), Pub. L. No. 107-155, 116 Stat. 81 (codified in various parts of Title 52 of the U.S. Code), to address "[t]hree important developments" in the role of money in federal elections: "[T]he increased importance of 'soft money,' the proliferation of 'issue ads,' and the disturbing findings of a Senate investigation into campaign practices related to the 1996 federal elections," which revealed some "elected officials' practice of granting special access in return for political contributions." *McConnell v. FEC*, 540 U.S. 93, 122, 129 (2003), *overruled in part on other grounds by Citizens United v. FEC*, 558 U.S. 310, 365 (2010) (upholding the Act's disclosure provision against Citizens United's as-applied challenge, but invalidating other provisions of the Act). Title I of the Act addresses the use of "soft money"—that is, donations made by individuals through political parties to benefit candidates. *See* 52 U.S.C. §§ 30101, 30104, 30116–30117, 30125. Title II, which is at issue here, regulates paid communications by outside organizations that could have the effect of "influencing the outcome of federal elections." *See id.* at 132; *see also* 52 U.S.C. §§ 30101, 30104, 30116–30118,

As relevant here, Section 30104 of the Act imposes a large-donor disclosure requirement on organizations that engage in candidate-referencing communications in the run up to a federal primary or general election. Specifically, the Act provides that:

> Every person who makes a disbursement for the direct costs of producing and airing electioneering communications in an aggregate amount of $10,000 during any calendar year shall, within 24 hours of each disclosure date, file with the Commission a statement containing the information described in paragraph (2).

52 U.S.C. § 30104(f)(1). Paragraph 2, in turn, requires the disclosure of "[t]he identification of the person making the disbursement"; "[t]he principal place of business of the person making the disbursement"; "[t]he amount of each disbursement of more than $200 during the period covered by the statement"; "the identification of the person to whom th[at] disbursement was made"; "[t]he elections to which the electioneering communications pertain"; "the names (if

2

known) of the candidates identified or to be identified"; and "the names and addresses of all contributors who contributed an aggregate amount of $1,000 or more" for the purpose of disseminating the electioneering communication. *Id.* § 30104(f)(2); *see* 11 C.F.R. § 104.20(c)(9) (requiring disclosure of qualifying donors only if the donation "was made for the purpose of furthering electioneering communications"); *see also Van Hollen, Jr. v. FEC*, 811 F.3d 486, 501 (D.C. Cir. 2016) (upholding the specific-purpose requirement in 11 C.F.R. § 104.20(c)(9)).

The Act defines an "electioneering communication" that triggers such donor disclosure as "any broadcast, cable, or satellite communication" that:

> (I) refers to a clearly identified candidate for Federal office;
>
> (II) is made within—
>
>> (aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or
>>
>> (bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and
>
> (III) in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.

52 U.S.C. § 30104(f)(3). When, as here, an electioneering communication refers to a Senate candidate, it is "targeted to the relevant electorate" if it "can be received by 50,000 or more persons" in "the State the candidate seeks to represent[.]" *Id.* § 30104(f)(3)(C).

## II

Independence Institute is a non-profit organization that conducts research and seeks to educate the public on a variety of policy issues, including healthcare, justice, education, and taxation. Indep. Inst.'s Statement of Undisputed Material

Facts, ECF No. 36-2 ("Indep. Inst. SUMF") ¶ 1.[2]  The Institute is a 501(c)(3) tax-exempt organization, 26 U.S.C. § 501(c)(3), based in Colorado.   Indep. Inst. SUMF ¶ 2.   As a part of its educational mission, the Institute produces advertisements that "mention the officeholders who direct" the policies of interest to the Institute.  Compl. ¶ 2.

United States Senator Mark Udall of Colorado was a candidate for reelection in the November 4, 2014 general election.   In the sixty days preceding that election, Independence Institute sought to run a radio advertisement that urged Coloradoans to call Senator Udall, as well as Senator Michael Bennet, to express support for the Justice Safety Valve Act, S. 619, 113th Cong. (2013) (reintroduced as S. 353, 114th Cong. (2015)).  Indep. Inst. SUMF ¶¶ 3–5.  The content of the advertisement is as follows:

> Let the punishment fit the crime.
>
> But for many federal crimes, that's no longer true.
>
> Unfair laws tie the hands of judges, with huge increases in prison costs that help drive up the debt.
>
> And for what purpose?
>
> Studies show that these laws don't cut crime.
>
> In fact, the soaring costs from these laws make it harder to prosecute and lock up violent felons.
>
> Fortunately, there is a bipartisan bill to help fix the problem – the Justice Safety Valve Act, bill number S. 619.
>
> It would allow judges to keep the public safe, provide rehabilitation, and deter others from committing crimes.

---

[2] Because we are at the summary judgment phase, our ruling construes all demonstrated facts in favor of the nonmovant. *See Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015).

Call Senators Michael Bennet and Mark Udall at 202-224-3121. Tell them to support S. 619, the Justice Safety Valve Act.

Tell them it's time to let the punishment fit the crime.

Paid for by Independence Institute, I2I dot org. Not authorized by any candidate or candidate's committee. Independence Institute is responsible for the content of this advertising.

*Id.* ¶ 5. Independence Institute planned to spend at least $10,000 on the advertisement, which would have reached at least 50,000 persons in the Denver metropolitan area. *Id.* ¶ 4.

The Institute, however, declined to run the advertisement during the 2014 election cycle because it was concerned that doing so would subject the Institute to the Bipartisan Campaign Reform Act's large-donor disclosure provision. Indep. Inst. SUMF ¶ 3 (noting that the Institute "wished to broadcast" the advertisement during the 2014 election season). Instead, in September 2014, the Institute filed suit against the Federal Election Commission asserting that application of the Act's disclosure provision to the specific Justice Safety Valve Act advertisement described above violated the First Amendment. The Institute also asked that its case be heard by a three-judge district court, as authorized by the Act, 52 U.S.C. § 30110 note. *See* Mot. to Convene Three-Judge Court, ECF No. 3. A single district court judge denied that motion on the ground that the Institute's challenge did not raise a substantial question, and granted summary judgment on the merits to the Commission. *Independence Inst. v. FEC*, 70 F. Supp. 3d 502, 506, 516 (D.D.C. 2014).

The court of appeals reversed, holding that the Institute was "entitled to make its case to a three-judge district court." *Independence Inst. v. FEC*, 816 F.3d 113, 117 (D.C. Cir. 2016); *see Shapiro v. McManus*, 136 S. Ct. 450, 455 (2015) ("'Constitutional claims will not lightly be found insubstantial for purposes of' the three-judge-court statute.") (quoting *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 147–148 (1980)); *see also Shapiro*, 136 S. Ct. at 456 (stating that the three-judge-court statute presents a "low bar"). The court of appeals' majority did not address the merits of the Institute's claim. Judge

Wilkins dissented, explaining that he would have affirmed the denial of the Institute's Motion for a Three-Judge District Court on the ground that the "immaterial factual distinctions that the Institute offers to distinguish its challenge from that in *Citizens United v. FEC*" do not present "a substantial constitutional question." *Independence Inst.*, 816 F.3d at 117–118 (Wilkins, J., dissenting).

On remand, this three-judge district court panel was designated to hear the Institute's as-applied challenge to the Act's disclosure provision. Designation of Judges to Serve on Three-Judge District Ct., ECF No. 30. The parties filed cross-motions for summary judgment. Neither party requested an expedited decision.

## III

A party is entitled to summary judgment "only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *See, e.g.*, *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). "'If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available.'" *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (quoting *Kuo–Yun Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994)). The parties have not identified any material factual disputes. Indeed the Commission did not even respond to the Institute's Statement of Undisputed Material Facts. Accordingly, we are tasked only with determining if the Institute or the Commission is entitled to judgment as a matter of law.

### A.    Mootness

The first thing we must decide is whether we can decide this case. Article III of the Constitution imposes important limits on the jurisdiction of federal courts. *See, e.g.*, *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997). Of most relevance here, Article III's case-or-controversy requirement means that, "[t]o qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" *Id.* at 67 (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)). "There is thus no case or controversy, and a suit becomes moot, 'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the

outcome.'" *See, e.g., Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) (quoting *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013)). When, as here, the complaint seeks only injunctive and declaratory relief, the plaintiff must demonstrate an enduring dispute or a material risk that the controversy will recur. "In general, a case becomes moot where the activities for which an injunction is sought have already occurred and cannot be undone." *Monzillo v. Biller*, 735 F.2d 1456, 1459 (D.C. Cir. 1984); *see City of Los Angeles v. Lyons*, 461 U.S. 95, 109–111 (1983) (failure to show that repetition of a past dispute is "realistically threatened" requires denial of "an injunction in a federal court, whether the injunction contemplates intrusive structural relief or the cessation of a discrete practice"); *Larsen v. United States Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) (case is moot when "any injunction or order declaring [the policy] illegal would accomplish nothing—amounting to exactly the type of advisory opinion Article III prohibits").

The question of mootness arises in this case because the Institute's complaint expressly seeks only to run a single advertisement during the 2014 general election season when Mark Udall was a candidate for the United States Senate from Colorado. The complaint, moreover, is quite explicit that the only constitutional challenge it raises and the only relief it seeks is with respect to the particular Justice Safety Valve Act advertisement. *See* Compl. ¶ 3 ("The Independence Institute plans to produce *an issue advertisement*, to be aired on broadcast radio, which will discuss federal sentencing guidelines. *The advertisement* will mention Senators Mark Udall and Michael Bennet and ask that they support the Justice Safety Valve Act.") (emphasis added); *id.* ¶¶ 30–38 (describing the content of the communication under the heading "[t]he advertisement"); *id.* ¶ 30 ("As part of its mission, the Independence Institute wishes to run an advertisement discussing federal sentencing guidelines."); *id.* ¶¶ 30–35 (detailing the proposed Justice Safety Valve advertisement); *id.* ¶¶ 36–37 (alleging that the Institute wants to raise funds for "this specific advertisement"); *id.* ¶ 105 ("In this case, the Independence Institute presents *a* genuine issue advertisement[.]") (emphasis added); *id.* ¶¶ 105–111, 113, 116–117, 119, 128–129 (alleging causes of action in terms of "this specific advertisement," "the proposed advertisement," and the "advertisement"); *id.* (Prayers for Relief) (seeking relief only as to the Institute's "proposed advertisement") (emphasis added).

Needless to say, the 2014 election is long since over. Mark Udall lost, and is no longer a candidate whose naming in the advertisement could trigger the Act's disclosure requirement. Nevertheless, it is well settled that a case is not moot if the alleged harm is "capable of repetition, yet evading review," in that "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Turner v. Rogers*, 564 U.S. 431, 440 (2011) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)).

With respect to the first prong of that test, a case or controversy generally is considered "too short to be fully litigated prior to its cessation or expiration" if the lifespan of the dispute is less than two years. *See, e.g., Kingdomware Technologies, Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016) ("We have previously held that a period of two years is too short to complete judicial review[.]"); *cf. Turner*, 564 U.S. at 440 (twelve months is a sufficiently short duration).

With respect to the second prong, the expectation that the same litigant will come before the court with the same issue again must be more than theoretical or a mere possibility; it must be "reasonable" to expect. *See Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 187–188 (1979) (case was moot because there was "no evidence creating a reasonable expectation that the Chicago Board w[ould] repeat its purportedly unauthorized actions in subsequent elections"); *see also American Bar Ass'n v. FTC*, 636 F.3d 641, 645–647 (D.C. Cir. 2011) (holding a case moot because an intervening legislative change made the prospect of the issues arising again "nothing more than possibilities regarding regulations and enforcement policies that do not presently exist").

The Supreme Court, moreover, has found that challenges to campaign-finance and electoral-communication regulations can often fit the capable-of-repetition mold given the generally time-sensitive nature of both the desired communications and the governmental limitations. In particular, in *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007), the Supreme Court held that, even though the election had passed, Wisconsin Right to Life's challenge to the Bipartisan Campaign Reform Act's restrictions on corporate speech was not moot

because the group "credibly claimed that it planned on running 'materially similar' future targeted broadcast ads mentioning a candidate within the blackout period," *id.* at 463; *see also id.* at 459–460 (specifically discussing a series of similar advertisements that Wisconsin Right to Life sought to run during the blackout period).[3]

In response to the court's order for briefing on the question of mootness in this case, *see* Scheduling Order, ECF No. 35 at 2, the Institute submitted a declaration that says simply that it "inten[ds] in future years to run substantively similar advertisements to the one at issue here," Indep. Inst. SUMF ¶ 6. *See also id.* (citing a pre-2014 election declaration and press release, and a 2015 declaration submitted to the D.C. Circuit that simply described and quoted the 2014 press release). The Institute did not attempt to amend or to supplement its complaint. Nor did it seek to clarify the contours of its as-applied constitutional challenge to the extent it went beyond the specific Justice Safety Valve Act advertisement on which the complaint exclusively focused.

The Institute argues that its single, unelaborated allegation precludes a determination of mootness under *Wisconsin Right to Life*. That may be. But it bears noting that this case differs from *Wisconsin Right to Life* in some potentially material respects. First, unlike the complaint in *Wisconsin Right to Life*, the Institute deliberately confined its complaint, its prayer for relief, and its constitutional arguments to the single question of whether applying the Act's large-donor disclosure rule to the Justice Safety Valve Act violated the First Amendment. Despite having ample opportunity to amend its complaint to add allegations identifying the additional speech to which its as-applied challenge should be applied or to request *some* form of relief that goes beyond the one single advertisement, the Institute has steadfastly declined to do so. Indeed, comparing the complaint in *Wisconsin Right to Life* to the Institute's complaint here reveals

---

[3] *See also Norman v. Reed*, 502 U.S. 279, 288 (1992) (passage of election did not moot the case because "[t]here would be every reason to expect the same parties to generate a similar, future controversy subject to identical time constraints if we should fail to resolve the constitutional issues that arose in 1990"); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 774-775 (1978) (case was not moot even though the election had passed because there was no "serious doubt that there [was] a 'reasonable expectation'" that appellants would be "subject to the threat of prosecution" again).

how narrowly the Institute framed its as-applied claim in this case. *Compare* Am. Compl. Prayer for Relief, *Wisconsin Right to Life v. FEC*, 466 F. Supp. 2d 195 (D.D.C. 2006) (No. 04-1260) (seeking declaratory judgment as to any "electioneering communications by WRTL that constitute grass-roots lobbying"), *with* Indep. Inst. Compl. Prayer for Relief (seeking declaratory and injunctive relief only for the Institute's single "proposed advertisement").[4] Given that the mootness question has arisen at the earliest stages of this case in district court—and not after entry of a final district court judgment as occurred in *Wisconsin Right to Life*—the Institute's unwillingness to amend its complaint to avoid a potential Article III problem, or even to clarify what its as-applied challenge is applied to, seems to be a deliberate choice.

Second, there is a substantial question whether the constitutional dispute over the Institute's Justice Safety Valve Act advertisement will evade review. The Institute acknowledges that, after the 2016 election cycle concludes, neither of the Colorado Senators that its advertisement targets will be up for election before the 2020 primary season, and thus that the Act will not apply to this advertisement for roughly another four years. Four years would provide the Institute with sufficient time to litigate its challenge before the next election.

Fortunately, we need not decide whether the Institute's decision not to amend its complaint or otherwise to seek relief for its as-applied claim to any anticipated communications beyond this single advertisement renders this case

---

[4] *Compare also* Am. Compl. ¶ 6, *Wisconsin Right to Life* ("This case challenges the prohibition as applied to grass-roots lobbying on the facts of this case, which involves broadcast advertisements (true and accurate transcripts of current versions of the ads are attached as Exhibit[s] A, B, and C) that are paid for by WRTL and that encourage Wisconsin listeners to contact their U.S. Senators (Sen. Russell Feingold and Sen. Herb Kohl)"), *with* Indep. Inst. Compl. ¶ 3 ("The Independence Institute plans to produce *an issue advertisement*, to be aired on broadcast radio, which will discuss federal sentencing guidelines. *The advertisement* will mention Senators Mark Udall and Michael Bennet and ask that they support the Justice Safety Valve Act.") (emphasis added); and *compare* Am. Compl. ¶ 14, *Wisconsin Right to Life* (during the Act's large-donor disclosure period, "the current ads (Exhibits A, B, and C) and materially similar ads will become electioneering communications as to Wisconsin Senatorial candidate Russell Feingold, and WRTL will be prohibited from running these ads"), *with* Indep. Inst. Compl. ¶¶ 105–111, 113, 116–117, 119, 128–129 (alleging causes of action in terms of "this specific advertisement," "the proposed advertisement," and the "advertisement").

moot. That is because the other Senator referenced in the advertisement—Senator Michael Bennet—is up for election this Fall, and the Institute made clear at oral argument that it still desires to run this particular advertisement during the 2016 general election cycle (notwithstanding its failure to seek expedition):

> Court:   You're telling us you're going to run this ad again, even though you didn't say that in your declaration? That's now the representation on the record?

> Mr. Dickerson:  Yes, that's the representation on the record.

*See* Oral Arg. Tr. 22:17-22. Accordingly, the case before us is not moot.

## B.   Merits

There is no dispute that the Institute's advertisement meets the statutory definition of an electioneering communication under the Act. The advertisement mentions a Senate candidate by name; it would air within the sixty days preceding a general election; it is targeted to reach at least 50,000 persons in Colorado; and it would cost at least $10,000. *See* 52 U.S.C. § 30104(f). Accordingly, if the Institute were to run the advertisement as intended, the Institute would have to disclose the names of those donors that contributed at least $1,000 for the purpose of funding the advertisement. *See* 11 C.F.R. § 104.20(c)(7) & (9); *Van Hollen, Jr.*, 811 F.3d at 501-502.

The Institute argues that the Act's large-donor disclosure requirement, as applied to this particular advertisement, violates its First Amendment right to free speech in two ways. First, the Institute argues that the Justice Safety Valve Act advertisement is "genuine issue advocacy" that the Constitution mandates must be exempted from the disclosure of large donors. *See* Inst. Mot. for Summ. J. at 26–39. Second, the Institute contends that, because its status as a non-profit under Section 501(c)(3) of the Internal Revenue Code precludes it from engaging in political activity, this advertisement on a legislative matter must constitutionally be exempted from the large-donor disclosure requirement. *See id.* at 19–26. Both arguments founder on Supreme Court precedent, and the Institute's proffered distinctions make no constitutional difference.

11

## 1.   *Issue Advocacy*

The Supreme Court has twice considered and twice upheld the Bipartisan Campaign Reform Act's large-donor disclosure provision, and in doing so has rejected the very type of issue-centered exception for which the Institute argues.  In *McConnell*, the Court first addressed the Act's restrictions on corporate speech and, in so doing, specifically "rejected the notion that the First Amendment requires Congress to treat so-called issue advocacy differently from express advocacy." 540 U.S. at 196.  Turning to the large-donor disclosure provision that is at issue in this case, the Supreme Court rejected the plaintiffs' *facial* challenge on the ground that that drawing a line between express advocacy and issue advocacy was just as untenable for the Act's disclosure provision as it was for the Act's other provisions.  *See id.* at 195.  The Supreme Court also ruled that the disclosure provision serves "important state interests," such as "providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions[.]" *Id.* at 196.

In *Citizens United*, the Supreme Court found no merit in Citizens United's *as-applied* challenge to the large-donor disclosure requirement.  558 U.S. 310, 366–371.  Citizens United argued that the provision was unconstitutional as applied to both a movie about Hillary Clinton and three advertisements for the movie because such speech was not a form of "express advocacy." *Id.* at 368.  In language that speaks directly to the Institute's proposed issue-advocacy exception, the Supreme Court ruled that the First Amendment does not require limiting the Act's large-donor disclosure requirements to "speech that is the functional equivalent of express advocacy." *Id.* at 369.  The Supreme Court explained that its holding in *Wisconsin Right to Life*, 551 U.S. at 469–476, which limited restrictions on independent expenditures to express advocacy and its functional equivalent, cannot be imported into the Act's disclosure requirements.  *Citizens United*, 558 U.S. at 368–369.  That is so, the Court reasoned, because "disclosure is a less restrictive alternative to more comprehensive regulations of speech." *Id.* at 369.

The Court also emphasized that its precedents have consistently upheld the constitutionality of disclosure requirements, even while calling into question other campaign finance-related restrictions.  *See Citizens United*, 558 U.S. at 369

(describing *Buckley v. Valeo*, 424 U.S. 1 (1976), where "the Court upheld a disclosure requirement for independent expenditures even though it invalidated a provision that imposed a ceiling on those expenditures;" *McConnell*, where "three Justices who would have found § 441b to be unconstitutional nonetheless voted to uphold [the Act's] disclosure and disclaimer requirements"; and *United States v. Harriss*, 347 U.S. 612, 625 (1954), where "the Court * * * upheld registration and disclosure requirements on lobbyists, even though Congress has no power to ban lobbying itself"). The Court concluded by underscoring the constitutionally permissible reach of the Act's disclosure provision, explaining that, "[e]ven if the ads only pertain[ed] to a commercial transaction, the public ha[d] an interest in knowing who is speaking about a candidate shortly before an election." *Id.*[5]

The Institute nevertheless contends that the constitutional rules demand a different result in this case because its advertisement identifies specific political candidates as part of "issue" advocacy focused on pending legislation.

Before addressing the Institute's specific arguments, the First Amendment issue it raises must be set in context. The Bipartisan Campaign Reform Act's disclosure provision does not purport to regulate issue advocacy per se. It only regulates those communications that (i) clearly identify an electoral candidate (ii) in the sixty days preceding a general election and the thirty days preceding a primary election. *See* 52 U.S.C. § 30104(f). The Institute thus is free to run its advertisement outside that electioneering window. And it may speak freely through its advertisement during the election cycle as well, as long as it does not either clearly identify a candidate for office in the process or rely upon donations

---

[5] Unlike Citizens United, the Institute does not claim that disclosure could expose its donors to threats, harassment, or reprisals, and it does not argue that we should overturn the disclosure requirement on that basis. *Compare Citizens United*, 558 U.S. at 370 ("In *McConnell*, the Court recognized that § 201 would be unconstitutional as applied to an organization if there were a reasonable probability that the group's members would face threats, harassment, or reprisals if their names were disclosed."), *with* Joint Stipulation and Order, ECF No. 14 ("The Independence Institute's challenge does not rely upon the probability that its donors will be subject to threats, harassments, or reprisals as a result of the Institute's filing of an Electioneering Communications statements pursuant to 52 U.S.C. § 30104(f)(1)-(2)[.]"). *See also Citizens United*, 558 U.S. at 370 ("Citizens United argues that disclosure requirements can chill donations to an organization by exposing donors to retaliation.").

of over $1000 that are specifically dedicated to running that candidate-referencing advertisement, *see Van Hollen, Jr., supra*.[6]

The constitutional question then is whether the First Amendment immunizes from large-donor disclosure the Institute's issue advertisement that explicitly references an electoral candidate by name in the run up to an election. The answer is "no" for three reasons.

*First*, the Supreme Court and every court of appeals to consider the question have already largely, if not completely, closed the door to the Institute's argument that the constitutionality of a disclosure provision turns on the content of the advocacy accompanying an explicit reference to an electoral candidate. In *McConnell*, the Supreme Court concluded that First Amendment precedent "amply supports application of [the Act's] disclosure requirements to the *entire range of 'electioneering communications.'*" 540 U.S. at 196 (emphasis added). In so doing, the Court specifically "rejected the notion that the First Amendment requires Congress to treat so-called issue advocacy differently from express advocacy[.]" *Id*. at 194. Likewise, in *Citizens United*, the Supreme Court ruled that advocacy— even if it takes the form of commercial speech—falls within the constitutional bounds of the donor-disclosure rule precisely because that advocacy points a finger at an electoral candidate. *See Citizens United*, 558 U.S. at 369.[7]

---

[6] Although the Justice Safety Valve Act has remained under legislative consideration for the last three years, the Institute has chosen for its own reasons not to run its proposed advertisement at all, even during the many months unregulated by the Act's electioneering restriction. *See* Justice Safety Valve Act, S. 619, 113th Cong. (2013) (reintroduced as S. 353, 114th Cong. (2015)).

[7] *See also Center for Individual Freedom v. Madigan*, 697 F.3d 464, 484 (7th Cir. 2012) ("*Citizens United* made clear that the wooden distinction between express advocacy and issue discussion does not apply in the disclosure context."); *National Org. for Marriage v. McKee*, 649 F.3d 34, 54–55 (1st Cir. 2011) ("We find it reasonably clear, in light of *Citizens United*, that the distinction between issue discussion and express advocacy has no place in First Amendment review of these sorts of disclosure-oriented laws."); *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1016 (9th Cir. 2010) ("Given the Court's analysis in *Citizens United*, and its holding that the government may impose disclosure requirements on speech, the position that disclosure requirements cannot constitutionally reach issue advocacy is unsupportable."). *Cf. Independence Institute v. Williams*, 812 F.3d 787, 795 (10th Cir. 2016) ("It follows from Citizens United that disclosure requirements can, if cabined within the bounds of exacting scrutiny, reach beyond express advocacy to at least some forms of issue speech.").

Under *McConnell* and *Citizens United*, then, it is the tying of an identified candidate to an issue or message that justifies the Bipartisan Campaign Reform Act's tailored disclosure requirement because that linkage gives rise to the voting public's informational interest in knowing "who is speaking about a candidate shortly before an election." *Citizens United*, 558 U.S. at 369; *see McConnell*, 540 U.S. at 197 ("'Plaintiffs' argument for striking down BCRA's disclosure provisions * * * ignores the competing First Amendment interests of individual citizens seeking to make informed choices in the political marketplace.'") (quoting *McConnell v. FEC*, 251 F. Supp. 2d 176, 237 (D.D.C. 2003)).  Indeed, it is telling that, in defining a "genuine issue ad" in *Wisconsin Right to Life*, the Supreme Court stated that such an advertisement would *not* "mention[] * * * candidacy" or a "challenger."  551 U.S. at 470.  Accordingly, it is hard to see any constitutional daylight between the Institute's issue advertisement and the issue advocacy to which the Supreme Court has already held that the Act's disclosure requirements can permissibly be applied.

*Second*, the Institute's proposed constitutional exception for "genuine" issue advocacy is entirely unworkable as a constitutional rule.  The Institute itself has offered no administrable rule or definition that would distinguish which types of advocacy specifically referencing electoral candidates would fall on which side of the constitutional disclosure line, or how the Commission could neutrally police it. The Institute emphasizes that the advertisement at issue here focuses on pending legislation, not candidates.  Yet it would blink reality to try and divorce speech about legislative candidates from speech about the legislative issues for which they will be responsible.  After all, the Institute's advertisement discusses a proposed bill designed to address inequities in the criminal justice system, which is a topic of substantial debate and interest in this electoral cycle.  And it takes little imagination to envision the electoral impact that could arise from linking candidates with proposed legislation in others areas of Institute interest, such as healthcare, educational programs, and taxes.

The Institute further contends that its advertisement does not take a position for or against the identified Senate candidate.  That is debatable.  After all, the advertisement plainly seeks to persuade listeners that the Justice Safety Valve Act addresses an issue of such preeminent importance that prospective voters should

inquire into the candidate's position on the legislation during the critical thirty- or sixty-day period leading up to an election. *See* Indep. Inst. SUMF ¶ 5 ("Call Senators Michael Bennet and Mark Udall at 202-224-3121. Tell them to support S. 619, the Justice Safety Valve Act. Tell them it's time to let the punishment fit the crime."). The advertisement also at least implies that the Senate candidate is not already on board as a committed supporter of the bill. Otherwise there would be no reason to ask Coloradoans to solicit the electoral candidate's support for the proposed law. *See* Oral Argument at 23:50, *Independence Institute v. FEC*, 816 F.3d 113 (D.C. Cir. 2016) (No. 14-5249) (Judge Wilkins' raises the question whether the advertisement impliedly communicates that the Colorado Senators do not currently support the Justice Safety Valve Act). And if the Senate candidate has already taken a position against the bill, the advertisement could very well be understood by Coloradoans as criticizing the Senate candidate's position. *See Independence Institute v. Williams*, 812 F.3d 787 (10th Cir. 2016) ("The advertisement here does not say much about Governor Hickenlooper, but it does insinuate, at minimum, that he has failed to take action on an issue that the Institute considers important. That could bear on his character or merits as a candidate.").

In any event, the First Amendment is not so tight-fisted as to permit large-donor disclosure only when the speaker invokes magic words of explicit endorsement. That would make the constitutional balancing of interests turn on form not substance. The Institute, in fact, exposed the untenability of its proposed "genuine" issue advocacy line when it acknowledged that a similarly designed Institute advertisement addressing health insurance "suggested [the candidate's] position on the issue being discussed." Indep. Inst. Reply Br. at 7. In *Independence Institute v. Williams*, the Institute challenged as unconstitutional a Colorado state law donor-disclosure requirement (which is virtually identical to the Bipartisan Campaign Reform Act's large-donor disclosure rule) as applied to "pure[]" issue advocacy. 812 F.3d at 789.[8] The Institute advertisement at issue there stated:

---

[8] *See Independence Institute*, 812 F.2d at 789–790 ("Colorado requires any person who spends at least $1000 per year on 'electioneering communications' to disclose the name, address, and occupation of any person who donates $250 or more for such communications," and defines "'electioneering communication'" as "'any communication broadcasted by television or radio' that 'unambiguously refers to any candidate' 'sixty days before a general election' and targets 'an

Doctors recommend a regular check up to ensure good health.

Yet thousands of Coloradoans lost their health insurance due to the new federal law.

Many had to use the state's government-run health exchange to find new insurance.

Now there's talk of a new $13 million fee on your insurance.

It's time for a check up for Colorado's health care exchange.

Call Governor Hickenlooper and tell him to support legislation to audit the state's health care exchange.

Independence Institute is responsible for the content of this advertising.

*Id.* at 790.

As noted, the Institute's briefing and argument in this court now acknowledge that its advertisement that (i) discusses a legislative issue of concern to the Institute, and (ii) asks constituents to contact a candidate about supporting the legislation can "suggest [the candidate's] position on the issue being discussed," Indep. Inst. Reply Br. at 7. Yet that implication triggers the exact same concerns for voter information that the Supreme Court held sustained the Act's disclosure provisions in *McConnell* and *Citizens United.*

The Institute nonetheless argues that the particular advertisement at issue here is constitutionally different because both Senators are mentioned in the Justice Safety Valve advertisement (only one of whom was running for office), and not just "a single candidate" as in the health insurance advertisement. *See* Indep. Inst. Reply Br. at 7. The Institute also suggests that advertisements addressing "a general category of executive power," rather than "a specific bill being advanced in

---

audience that includes members of the electorate for such public office.'") (quoting 1 COLO. CONST. Art. XXVIII, § 2(7)(a)).

the legislative body," should receive different constitutional treatment. Oral Arg. Tr. 24:3-5.[9]

Neither of the Institute's proposed distinctions makes constitutional sense. The voting public's interest in information about electioneering communications applies with equal force to candidates for multi-member bodies as to single officeholders. Either way, disclosure "permits citizens * * * to react to the speech * * * in a proper way," and such "transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages." *Citizens United*, 558 U.S. at 371. Nor does the Institute's attempted distinction between pending and proposed legislation hold up. Promises to introduce legislation or executive regulations are as common a form of appeal to voters as commitments to support existing bills and regulatory programs.[10]

In short, whatever difference the Institute may discern between express candidate advocacy and the Institute's proposed candidate-referencing issue advertisement, it is not a distinction of constitutional magnitude.

*Third*, and in any event, application of the large-donor disclosure requirement to the Institute's proposed Justice Safety Valve Act advertisement passes constitutional muster. The Supreme Court subjects regulatory burdens imposed on campaign-related speech to "'exacting scrutiny,' which requires a 'substantial relation' between the disclosure requirement and a 'sufficiently

---

[9] The Institute's finely drawn distinctions underscore the difficulty that could accompany any effort to determine the as-applied constitutionality of the donor disclosure provision to other unidentified Institute advertisements. *See* Section III.A, *supra* (discussing mootness).

[10] *See, e.g.*, Republican Party Platform of 1860, THE AMERICAN PRESIDENCY PROJECT, ¶ 8, http://www.presidency.ucsb.edu/ws/?pid=29620 ("That the normal condition of all the territory of the United States is that of freedom: That, as our Republican fathers, when they had abolished slavery in all our national territory, ordained that 'no persons should be deprived of life, liberty or property without due process of law,' it becomes our duty, *by legislation, whenever such legislation is necessary*, to maintain this provision of the Constitution against all attempts to violate it; and we deny the authority of Congress, of a territorial legislature, or of any individuals, to give legal existence to slavery in any territory of the United States.") (emphasis added).

important' governmental interest." *Citizens United*, 558 U.S. at 366-367 (quoting *Buckley*, 424 U.S. at 74.).

The Supreme Court has already held that the Bipartisan Campaign Reform Act's large-donor disclosure rule advances substantial and important governmental interests in "providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions." *McConnell*, 540 U.S. at 196; *see Citizens United*, 558 U.S. at 369 (upholding the disclosure provision against Citizens United's as-applied challenge based on the government's important informational interest). The Institute's advertisement triggers those same informational interests because it links an electoral candidate to a political issue— pending federal legislation addressing unjust sentencing of criminal defendants— and solicits voters to press the legislative candidate for his position on the legislation in the run up to an election. *See Citizens United*, 558 U.S. at 369 (concluding that such would "help viewers make informed choices in the political marketplace"); *McConnell*, 540 U.S. at 196 ("The factual record demonstrates that the abuse of the present law not only permits corporations and labor unions to fund broadcast advertisements designed to influence federal elections, but permits them to do so while concealing their identities from the public.") (quoting *McConnell*, 251 F. Supp. 2d at 237); *see also SpeechNow.org v. FEC*, 599 F.3d 686, 698 (D.C. Cir. 2010) (en banc) ("But the public has an interest in knowing who is speaking about a candidate and who is funding that speech, no matter whether the contributions were made towards administrative expenses or independent expenditures."). Providing the electorate with information about the source of the advertisement will allow voters to evaluate the message more critically and to more fairly determine the weight it should carry in their electoral judgments.

Moreover, the large-donor disclosure requirement is tailored to substantially advance those interests. It "'impose[s] no ceiling on campaign related activities,' * * * and 'do[es] not prevent anyone from speaking.'" *Citizens* United, 558 U.S. at 366 (quoting *McConnell*, 540 U.S. at 201). In addition, disclosure is limited to only those substantial donors who contribute $1000 or more, and do so for the specific purpose of supporting the advertisement. *See* 11 C.F.R. § 104.20(c)(9); *Van Hollen, Jr.*, 811 F.3d at 501.

As in *Citizens United*, that informational interest alone is sufficient to uphold the disclosure provisions against the Institute's as-applied challenge. *See* 558 U.S. at 369 ("[T]he informational interest alone is sufficient to justify application of § 201 to these ads[.]"). That the Act's disclosure provisions advance additional governmental interests simply reinforces the constitutionality of the Act's application to the Institute's advertisement. For instance, disclosure will assist the public, the Federal Election Commission, and Congress in monitoring those who seek to influence the issues debated during peak election season and to link candidates in the voters' eyes with specific policy matters. *See McConnell*, 540 U.S. at 129-133. Additionally, large-donor disclosures help the Commission to enforce existing regulations and to ensure that foreign nationals or foreign governments do not seek to influence United States' elections. *See Buckley*, 424 U.S. at 67–68 ("[R]ecordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations[.]"); 52 U.S.C. § 30121(a)(1)(C) ("It shall be unlawful for a foreign national, directly or indirectly to make an expenditure, independent expenditure, or disbursement for an electioneering communication[.]"); *SpeechNow*, 599 F.3d at 698 ("[R]equiring disclosure of such information deters and helps expose violations of other campaign finance restrictions, such as those barring contributions from foreign corporations or individuals.").[11]

Disclosure will also "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity." *Buckley*, 424 U.S. at 67. Arming voters with information about "a candidate's most generous supporters," whether direct or indirect, makes it easier "to detect any post-election special favors that may be given in return." *Id.* Indeed, given the information that the Institute's advertisement can convey to voters, a challenger's supporters could embrace the advertisement as a means of

---

[11] The vital importance of determining if foreign nationals are supporting candidates has been underscored in this election. *See* Joint Statement from the Department of Homeland Security and Office of the Director of National Intelligence on Election Security, Director of National Intelligence (Oct. 7, 2016), https://www.dni.gov/index.php/newsroom/press-releases/215-press-releases-2016/1423-joint-dhs-odni-election-security-statement ("The U.S. Intelligence Community (USIC) is confident that the Russian Government directed the recent compromises of e-mails from US persons and institutions, including from US political organizations.").

highlighting a point of difference with the incumbent or criticizing the incumbent's stance on or lassitude concerning an issue.

### 2. Section 501(c)(3) Status

The Institute's argument that its status as a Section 501(c)(3) tax-exempt non-profit makes a constitutional difference fares no better. The First Amendment permits disclosure provisions that, as the Act does, regulate speech based on its reference to electoral candidates, and not on the speaker's identity or taxpaying status. *See McConnell*, 540 U.S. at 194 (explaining that the Act's definition of electioneering communications is constitutionally permissible in part because the term, and its regulations, "appl[y] only (1) to a broadcast (2) *clearly identifying a candidate for federal office,* (3) aired within a specific time period, and (4) targeted to an identified audience of at least 50,000 viewers or listeners.") (emphasis added). Indeed, it is the Institute's proposed speaker-specific exemption that could stir up constitutional trouble. *See Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 117 (1991) ("The government's power to impose content-based financial disincentives on speech does not vary with the identity of the speaker."); *Pacific Gas & Elec. Co. v. Public Utilities Comm'n of Cal.*, 475 U.S. 1, 8 (1986) ("The identity of the speaker is not decisive in determining whether speech is protected.").

The Institute notes that the Commission once considered an exemption for 501(c)(3) organizations. Indep. Inst. Mot. for Summ. J. at 21 n. 12. But that attempted distinction was struck down as arbitrary and capricious, which underscores the frailty of the Institute's argument. *See Shays v. FEC*, 337 F. Supp. 2d 28, 124-128 (D.D.C. 2004), *aff'd on other grounds*, 414 F.3d 76 (D.C. Cir. 2005); *see also Delaware Strong Families v. Attorney Gen. of Del.*, 793 F.3d 304, 308–309 (3d Cir. 2015) (rejecting a 501(c)(3) organization's challenge to Delaware's BCRA analogue, and holding that "it is the conduct of an organization, rather than an organization's status with the Internal Revenue Service, that determines whether it makes communications subject to the [Delaware] Act"); *Center for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270, 289–290 (4th Cir. 2013) (invalidating the 501(c)(3) exemption in West Virginia's BCRA analogue because that exemption materially undermined the government's asserted "interest in informing the electorate").

Lastly, the Institute cites to the D.C. Circuit's decision striking down as void for vagueness a disclosure provision in the Federal Election Campaign Act Amendments of 1974, Pub. L. No. 93-443, Title II, § 208(a), 88 Stat. 1279 *repealed by* Federal Election Campaign Act Amendments of 1976, Pub. L. No. 94-283, Title I, § 105, 90 Stat. 481 (1976). *See Buckley v. Valeo*, 519 F.2d 821, 870-879 (D.C. Cir. 1975), *rev'd on other grounds,* 424 U.S. 1 (1976). That disclosure provision, however, was materially different from the one at issue here because it (i) did not limit disclosure to large donors, and (ii) applied to publications and not just broadcasting. *Id.* at 869. Nailing the coffin shut on the Institute's argument, the Supreme Court specifically held in *McConnell* that the definition of electioneering communications in the Bipartisan Campaign Reform Act, and the disclosure provision to which those communications are subject, "raise[] none of the vagueness concerns that drove our analysis in *Buckley*." *McConnell*, 540 U.S. at 194.

## IV

In conclusion, the Institute's arguments that the Act's large-donor disclosure provisions are unconstitutional as applied to its Justice Safety Valve Act advertisement all fail. If the Institute chooses to run that advertisement during the balance of this election cycle or in future elections, it will have to comply with the Bipartisan Campaign Reform Act's disclosure provision, 52 U.S.C. § 30104(f).

A final, appealable order DENYING the Institute's Motion for Summary Judgment and GRANTING the Federal Election Commission's Motion for Summary Judgment accompanies this Opinion.

Signed on this 3rd day of November, 2016.

**Hon. Patricia A. Millett**
United States Court of Appeals for the District of Columbia Circuit

**Hon. Colleen Kollar-Kotelly**
United States District Court for the District of Columbia

**Hon. Amit P. Mehta**
United States District Court for the District of Columbia